Opinion for the Court filed by Circuit
Judge KAVANAUGH, with whom Circuit *4 Judge HENDERSON joins, and with whom Circuit Judge BROWN joins as to Part IV except footnotes. 17, 18, and 20.
Opinion concurring in part filed by Circuit Judge BROWN.
KAVANAUGH, Circuit Judge:
A non-profit group , known as EMILY’s List promotes abortion rights and supports pro-choice Democratic women candidates. It challenges several new Federal Election Commission regulations that restrict how non-profits may spend and raise money to advance their preferred' policy positions and candidates. EMILY’s List argues that the regulations violate the First Amendment.
The First Amendment, as interpreted by the Supreme Court, protects the right of individual citizens to spend unlimited amounts to express their views about policy issues and candidates for public office. Similarly, the First Amendment, as the Court has construed it, safeguards the right of citizens to band together and pool their resources as an unincorporated group or non-profit organization in order to express their views about policy issues and candidates for public office. We agree with EMILY’s List that the new FEC regulations contravene those principles and violate the First Amendment. We reverse the judgment of the District Court and direct it to enter judgment for EMILY’s List and to vacate the challenged regulations.
I
In the wake of the 2002 Bipartisan Campaign Reform Act and the Supreme Court’s 2003 decision in McConnell v. FEC, the election season of 2004 erupted with bitter accusations about the activities of certain non-profit entities. The controversy was popularly known by a single term — “527s”—that refers to the section of the tax code applicable to nonprofits engaged in political activities. The debate arose after wealthy individuals contributed huge sums of money to nonprofits ranging from America Coming Together to MoveOn.org to Swift Boat Veterans for Truth in order to support advertisements, get-out-the-vote efforts, and voter registration drives. In total during the 2004 campaign, these groups reportedly spent several hundred million dollars.
As the campaign unfolded, many in both major parties — including President Bush and Senator Kerry — questioned the activities of certain non-profits. Some encouraged the FEC to ban large donations to non-profit entities in the same way that Congress in BCRA had banned large contributions to political parties. Proponents of additional regulation reasoned that nonprofits had replaced political parties as the soft-money “loophole” in the campaign finance system. See Edward B. Foley & Donald Tobin, The New Loophole?: 527s, Political Committees, and McCain-Feingold, BNA Money & Pol. Rep., Jan. 7, 2004.
In response, the FEC did not ban nonprofits from receiving and spending large donations, as some had urged. But the FEC did limit how much non-profits such as EMILY’s List could raise and spend. The FEC achieved this objective by dictating that covered non-profits pay for a large percentage of election-related activities out of their hard-money accounts. See 11 C.F.R. §§ 106.6(c), (f).[1] Because donations to those hard-money accounts are *5 capped at $5000 annually for individual contributors, the FEC’s allocation regulations substantially restrict the ability of non-profits to spend money for election-related activities such as advertisements, get-out-the-vote efforts, and voter registration drives. The regulations separately require that donations to non-profits be considered hard money subject to the $5000 cap if the corresponding solicitation indicated that donations would be used to support the election or defeat of a federal candidate. See id. § 100.57.
In early 2005, EMILY’s List filed suit, arguing that the new regulations violated the First Amendment and the Federal Election Campaign Act. In 2008, the District Court upheld the regulations in their entirety.
II
To assess the constitutionality of the new FEC regulations, we initially must address at some length the relevant First Amendment principles set forth by the Supreme Court.
A
Ratified in 1791, the First Amendment provides that “Congress shall make no law ... abridging the freedom of speech.” U.S. Const, amend. I. This guarantee “has its fullest and most urgent application precisely to the conduct of campaigns for political office.” Buckley v. Valeo, 424 U.S. 1, 15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (internal quotation marks omitted). The Amendment “protects political association as well as political expression.” Id.; see also NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).
In analyzing the interaction of the First Amendment and campaign finance laws, the Court has articulated several overarching principles of relevance here.
First, the Court has held that campaign contributions and expenditures constitute “speech” within the protection of the First Amendment. In Buckley, the foundational case, the Court definitively ruled that “contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities.” 424 U.S. at 14, 96 S.Ct. 612. The Court has never strayed from that cardinal tenet, notwithstanding some passionate objections. See, e.g., Nixon v. Shrink Mo. Gov’t PAC, 528 U.S. 377, 398, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (Stevens, J., concurring) (“Money is property; it is not speech.”); J. Skelly Wright, Politics and the Constitution: Is Money Speech?, 85 YALE L.J. 1001 (1976).
Second, the Court has ruled that the Government cannot limit campaign contributions' and expenditures to achieve “equalization” — that is, it cannot restrict the speech of some so that others might have equal voice or influence in the electoral process. In perhaps the most important sentence in the Court’s entire campaign finance jurisprudence, Buckley stated: “[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment.” 424 U.S. at 48-49, 96 S.Ct. 612. The Court added that the Government’s interest in “equalizing the relative ability of individuals and groups to influence the outcome of elections” does not justify regulation. Id. at 48, 96 S.Ct. 612.
In Davis v. FEC, the Court strongly reiterated that “equalization” is not a “legitimate government objective.” — U.S. -, 128 S.Ct. 2759, 2773, 171 L.Ed.2d 737 (2008). The Davis Court approvingly quoted Justice Kennedy’s observation in *6 Austin v. Michigan Chamber of Commerce that “the notion that the government has a legitimate interest in restricting the quantity of speech to equalize the relative influence of speakers on elections” is “antithetical to the First Amendment.” Id. (citation and internal quotation marks omitted); see also Austin v. Mich. Chamber of Commerce, 494 U.S. 652, 684, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) (Scalia, J., dissenting) (“This illiberal free-speech principle of ‘one man, one minute’ was proposed and soundly rejected in Buckley”).[2]
Third, the Court has recognized a strong governmental interest in combating corruption and the appearance thereof. See Buckley, 424 U.S. at 26-27, 45-48, 96 S.Ct. 612; see also McConnell v. FEC, 540 U.S. 93, 154, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003). This, indeed, is the only interest the Court thus far has recognized as justifying campaign finance regulation. Davis, 128 S.Ct. at 2773 (“Preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances.”) (citation and internal quotation marks omitted). Importantly, the Court has emphasized that the anti-corruption rationale is not boundless. The core corruption that Government may permissibly target with campaign finance regulation “is the. financial quid pro quo: dollars for political favors.” FEC v. Nat’l Conservative PAC (NCPAC), 470 U.S. 480, 497, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). This anticorruption interest is implicated by contributions to candidates: “To the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined.” Buckley, 424 U.S. at 26-27, 96 S.Ct. 612; see also Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 296-97, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) (“Buckley identified a single narrow exception to the rule that limits on political activity were contrary to the First Amendment”; the exception relates “to the perception of undue influence of large contributors to a candidate”). Based on the close relationship between candidates and parties and record evidence demonstrating that political parties sold access to candidates in exchange for contributions, the Court has held that the anti-corruption interest also justifies limits on contributions to parties. See McConnell, 540 U.S. at 154, 124 S.Ct. 619; see also Buckley, 424 U.S. at 38, 96 S.Ct. 612.[3]
Fourth, in applying the anti-corruption rationale, the Court has afforded stronger protection to expenditures by citizens and groups • (for example, for advertisements, get-out-the-vote efforts, and voter registration activities) than it has provided to their contributions to candidates or parties. The Court has explained that contributions to a candidate or party pose a *7 greater risk of quid pro quo corruption than do expenditures. See Buckley, 424 U.S. at 46-47, 96 S.Ct. 612. At the same time, the Court has stated that limits on contributions to candidates or parties pose only a “marginal restriction upon the contributor’s ability to engage in free communication.” Id. at 20-21, 96 S.Ct. 612. By contrast, expenditure restrictions limit “political expression at the core of our electoral process and of the First Amendment freedoms.” Id. at 39, 96 S.Ct. 612 (internal quotation marks omitted). A “restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.” Id. at 19, 96 S.Ct. 612. The Court’s jurisprudence, in short, reflects a “fundamental constitutional difference between money spent to advertise one’s views independently of the candidate’s campaign and money contributed to the candidate to be spent on his campaign.” NCPAC, 470 U.S. at 497, 105 S.Ct. 1459 (emphases added); see also Randall v. Sorrell, 548 U.S. 230, 241-42, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006).[4]
In maintaining this line between (i) contributions to candidates or parties and (ii) expenditures, the Court has acknowledged that a citizen’s or group’s large expenditure — for example, in financing advertisements or get-out-the-vote activities — may confer some benefit on a candidate and thereby give influence to the spender. But the Court nonetheless has consistently dismissed the notion that expenditures implicate the anti-corruption interest. See Buckley, 424 U.S. at 47, 96 S.Ct. 612 (expenditures not “a quid pro quo for improper commitments from the candidate”); see also McConnell, 540 U.S. at 153, 124 S.Ct. 619 (“mere political favoritism or opportunity for influence alone is insufficient to justify regulation”); id. at 156-57 n. 51, 124 S.Ct. 619 (Congress could not regulate talk show hosts or newspaper editors “on the sole basis that their activities conferred a benefit on the candidate”); NCPAC, 470 U.S. at 498, 105 S.Ct. 1459 (“exchange of political favors for uncoordinated expenditures remains a hypothetical possibility and nothing more”).
Fifth, the Court has been somewhat more tolerant of regulation of for-profit corporations and labor unions. The Court has permitted statutory limits on contributions that for-profit corporations and unions make from their general treasuries to candidates and parties.[5] More controversially, the Court has carved out a significant exception to Buckley’s holding on expenditures: The Court has upheld laws that prohibit for-profit corporations and *8 unions from making expenditures for activities expressly advocating the election or defeat of a federal candidate. The Court has permitted those expenditure limits on the ground that they restrain the “corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public’s support for the corporation’s political ideas.” Austin, 494 U.S. at 660, 110 S.Ct. 1391; see also McConnell, 540 U.S. at 204-05, 124 S.Ct. 619; but see First Nat’l Bank of Boston v. Bellotti, 435 U.S. 765, 776-77, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); Buckley, 424 U.S. at 48-49, 96 5. Ct. 612.[6]
To sum up so far: In reconciling the competing interests, the Supreme Court has generally approved statutory limits on contributions to candidates and political parties as consistent with the First Amendment. The Court has rejected expenditure limits on individuals, groups, candidates, and parties, even though expenditures may confer benefits on candidates. And the Court has upheld limits on for-profit corporations’ and unions’ use of their general treasury funds to make campaign contributions to candidates or political parties or to make expenditures for activities expressly advocating the election or defeat of federal candidates.
B
This case does not involve regulation of candidates, parties, or for-profit corporations. Rather, this case concerns the FEC’s regulation of non-profit entities that are not connected to a candidate, party, or for-profit corporation. We thus must consider how the constitutional principles outlined above apply to non-profits — and in particular to three different kinds of non-profits: (i) those that only make expenditures; (ii) those that only make contributions to candidates or parties; and (iii) those that do both. For purposes of the First Amendment analysis, the central issue turns out to be whether independent non-profits are treated like individual citizens (who under Buckley have the right to spend unlimited money to support their preferred candidates) or like political parties (which under McConnell do not have the right to raise and spend unlimited soft money).[7]
1
The first relevant category of non-profit entities consists of those that only make expenditures for political activities such as *9 advertisements, get-out-the-vote efforts, and voter registration drives. Non-profits in this category make no contributions to federal candidates or parties.
The Supreme Court’s case law establishes that those nonprofit entities, like individual citizens, are constitutionally entitled to raise and spend unlimited money in support of candidates for elected office — with the narrow exception that, under Austin, the Government may restrict to some degree how non-profits spend donations received from the general treasuries of for-profit corporations or unions. See Cal. Med. Ass’n v. FEC, 453 U.S. 182, 202-03, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (opinion of Blackmun, J.); see also FEC v. Mass. Citizens for Life, Inc. (MCFL), 479 U.S. 238, 259-65, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986); NCPAC, 470 U.S. at 501, 105 S.Ct. 1459; Citizens Against Rent Control, 454 U.S. at 296-99, 102 S.Ct. 434; Buckley, 424 U.S. at 47, 96 S.Ct. 612; N.C. Right to Life, Inc. v. Leake, 525 F.3d 274, 292-93 (4th Cir.2008).
Those principles were initially articulated in Cal-Med. There, Justice Blackmun determined that “contributions to political committees can be limited only if those contributions implicate the governmental interest in preventing actual or potential corruption, and if the limitation is no broader than necessary to achieve that interest.” Cal-Med, 453 U.S. at 203, 101 S.Ct. 2712 (opinion of Blackmun, J.). Applying that standard, he found that “contributions to a committee that makes only independent expenditures pose no such threat” of “actual or potential corruption.” Id. “By pooling their resources, adherents of an association amplify their own voices; the association is but the medium through which its individual members seek to make more effective the expression of their own views.” Id. (citation and internal quotation marks omitted). Justice Blackmun thus concluded that Government may not limit contributions to a non-profit that only makes expenditures.[8]
The Court reinforced those principles a year later in Citizens Against Rent Control There, the Court struck down limits on donations to a non-profit committee seeking to defeat a ballot measure. See Citizens Against Rent Control, 454 U.S. at 296-99, 102 S.Ct. 434. Building on the established right of individuals to make unlimited expenditures, the Court stated that there are “of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them.” Id. at 296, 102 S.Ct. 434. The Court further reasoned; “Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression.” Id. at 299, 102 S.Ct. 434. In the Court’s words, to place “a Spartan limit — or indeed any limit — on individuals wishing to band together to advance their views on a ballot *10 measure, while placing none on individuals acting alone, is clearly a restraint on the right of association.” Id. at 296, 102 S.Ct. 434.
In NCPAC, the Court reiterated- that the Government may not limit the spending of non-profits. The Court invalidated a law that restricted a group’s expenditures in support of a candidate who had accepted public financing. See NCPAC, 470 U.S. at 501, 105 S.Ct. 1459. The Court stated that citizens’ “collective action in pooling their resources to amplify their voices” is “entitled to full First Amendment protection....” Id. at 495, 105 S.Ct. 1459.
In MCFL, the Court again underscored that non-profit advocacy groups are generally entitled to raise and spend unlimited money on elections. The Court invalidated an expenditure limit imposed on a nonprofit corporation that had distributed a newsletter promoting pro-life candidates. The Court noted that individuals “contribute to a political organization in part because they regard such a contribution as a more effective means of advocacy than spending the money under their own personal direction.” MCFL, 479 U.S. at 261, 107 S.Ct. 616. The Court added that “[v]oluntary political associations do not suddenly present the specter of corruption merely by assuming the corporate form.” Id. at 263, 107 S.Ct. 616; see also Austin, 494 U.S. at 701, 110 S.Ct. 1391 (Kennedy, J., dissenting) (MCFL held that “a nonprofit corporation engaged in political discussion of candidates and elections has the full protection of the First Amendment”). Adhering to MCFL, the McConnell Court ruled that BCRA’s ban on certain electioneering communications could not validly be applied to non-profit corporations. See McConnell, 540 U.S. at 210-11, 124 S.Ct. 619.
The principles set forth in Cal-Med, Citizens Against Rent Control, NCPAC, and MCFL are rooted in the Court’s consistent holdings beginning with Buckley that individual citizens may spend money without limit (apart from the limit on their own contributions to candidates or parties) in support of the election of particular candidates. After all, if one person is constitutionally entitled to spend $1 million to run advertisements supporting a candidate (as Buckley held), it logically follows that 100 people are constitutionally entitled to donate $10,000 each to a non-profit group that will run advertisements supporting a candidate.[9] Put another way: “If the First Amendment prohibits any limitation on how much money an independent political committee can spend on an independent-expenditure campaign, how can it permit limits on donations to committees that make only independent expenditures?” Richard Briffault, The 527 Problem and the Buckley Problem, 73 Geo. Wash. L.Rev. 949, 982 (2005); see also Edward B. Foley, The “Major Purpose” Test: Distinguishing Between Election-Focused and Issue-Focused Groups, 31 N. Ky. L.Rev. 341, 343 (2004) (stating “baseline proposition that it would be unconsti *11 tutional to limit the contributions that individuals may give to ideological groups to be used for electoral purposes”); Note, The Unconstitutionality of Limitations on Contributions to Political Committees in the 1976 Federal Election Campaign Act Amendments, 86 Yale L.J. 958 (1977).
These Supreme Court decisions reflect, moreover, the commonsense proposition that regulation of non-profits does not fit within the anti-corruption rationale, which constitutes the sole basis for regulating campaign contributions and expenditures. See Davis, 128 S.Ct. at 2773. As the Court has explained the anti-corruption principle, mere donations to non-profit groups cannot corrupt candidates and officeholders. In the words of the Fourth Circuit, it is “implausible that contributions to independent expenditure political committees are corrupting.” N.C. Right to Life, 525 F.3d at 293 (internal quotation marks omitted). And to the extent a nonprofit then spends its donations on activities such as advertisements, get-out-the-vote efforts, and voter registration drives, those expenditures are not considered corrupting, even though they may generate gratitude from and influence with officeholders and candidates. Rather, under Buckley, those expenditures are constitutionally protected. Therefore, limiting donations to and spending by non-profits in order to prevent corruption of candidates and officeholders represents a kind of “prophylaxis-upon-prophylaxis” regulation to which the Supreme Court has emphatically stated, “Enough is enough.” FEC v. Wis. Right to Life, Inc. (WRTL), 551 U.S. 449, 478-79, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (controlling opinion of Roberts, C.J.).
Writing for the Fourth Circuit, Judge Wilkinson recently summarized the relevant Supreme Court precedents, concluding that “the Court has never held that it is constitutional to apply contribution limits to political committees that make solely independent expenditures.” N.C. Right to Life, 525 F.3d at 292. Those nonprofit groups receive full First Amendment protection and are entitled to receive donations and make expenditures because they “offer an opportunity for ordinary citizens to band together to speak on the issue or issues most important to them.” Id. at 295. We agree with Judge Wilkinson’s assessment of the state of the law.
2
The second relevant category of nonprofits consists of those that only make contributions to federal candidates or political parties and make no expenditures. Given the constitutionally permissible caps on an individual donor’s contributions to candidates or parties, the Supreme Court has acknowledged the risk that individuals might use non-profits to evade those limits. In order to prevent circumvention of limits on an individual donor’s contributions to candidates and parties, the Court has held that non-profit entities can be required to make their own contributions to candidates and parties, as well as pay associated administrative expenses, out of a hard-money account that is subject to source and amount restrictions. See Cal-Med, 453 U.S. at 198-99, 101 S.Ct. 2712 (opinion of Marshall, J.); id. at 203-04, 101 S.Ct. 2712 (opinion of Blackmun, J.). As a majority of the Court pointed out in Cal-Med, doing so prevents non-profits from being used as “conduits” for illegal contributions to parties and candidates and thus prevents “evasion of the limitations on contributions” to a candidate. Id. at 203, 101 S.Ct. 2712 (opinion of Blackmun, J.); see also id. at 198, 101 S.Ct. 2712 (opinion of Marshall, J.) (limit on donations to non-profit prevents evasion of “$1,000 limit on contributions to candidates ... by channeling *12 funds” through the non-profit); Cal. Med. Ass’n v. FEC, 641 F.2d 619, 625 (9th Cir. 1980) (Kennedy, J.) (non-profit committee is “natural conduit for candidate contributions and ... the essential purpose of the provision here in question is to limit those contributions, not to limit expenditures for any other type of political advocacy”) (emphasis added).[10]
Consistent with Cal-Med’s ruling, FECA limits contributors to donating a maximum of $5000 per year to a nonprofit’s hard-money account. A non-profit in turn may contribute to a candidate or party only from that hard-money account. See 2 U.S.C. § 441a(a)(l)(C). And an individual’s contribution to a non-profit’s hard-money account may count against the individual’s aggregate annual contribution limits. See 2 U.S.C. § 441a(a)(3).
3
What about a non-profit entity that falls into both categories — in other words, a non-profit that makes expenditures and makes contributions to candidates or parties? EMILY’s List is a good example of such a hybrid non-profit: It makes expenditures for advertisements, get-out-the-vote efforts, and voter registration drives; it also makes direct contributions to candidates and parties. In all of its activities, its mission is to promote and safeguard abortion rights and to support the election of pro-choice Democratic women to federal, state, and local offices nationwide.
 The constitutional principles that govern such a hybrid non-profit entity follow ineluctably from the well-established principles governing the other two categories of non-profits. To prevent circumvention of contribution limits by individual donors, non-profit entities may be required to make their own contributions to federal candidates and parties out of a hard-money account — that is, an account subject to source and amount limitations ($5000 annually per contributor). Similarly, nonprofits also may be compelled to use their hard-money accounts to pay an appropriately tailored share of administrative expenses associated with their contributions. See Cal-Med, 453 U.S. at 198-99 n. 19, 101 S.Ct. 2712 (opinion of Marshall, J.). But non-profit entities are entitled to make their expenditures — such as advertisements, get-out-the-vote efforts, and voter registration drives — out of a soft-money or general treasury account that is not subject to source and amount limits. Stated another way: A non-profit that makes expenditures to support federal candidates does not suddenly forfeit its First Amendment rights when it decides also to make direct contributions to parties or candidates. Rather, it simply must ensure, to avoid circumvention of individual contribution limits by its donors, that its contributions to parties or candidates come from a hard-money account.[11]
*13 c
How does McConnell affect the above principles governing non-profits? McConnell upheld congressionally imposed limits on political parties receiving or spending soft money. Some have argued that the Government can similarly restrict soft-money contributions to and spending by nonprofits. In this case, the District Court accepted that reasoning in ruling for the FEC; it found non-profits similarly situated to political parties for purposes of the First Amendment analysis.
In our judgment, however, McConnell does not support such regulation of nonprofits. McConnell affirmed BCRA’s limits on contributions to political parties because of the close ties between candidates and parties and the extensive record evidence of what it deemed a threat of actual or apparent corruption — specifically, the access to federal officials and candidates that large soft-money contributors to political parties received in exchange for their contributions. The Court said that it was “not unwarranted for Congress to conclude that the selling of access gives rise to the appearance of corruption.” McConnell, 540 U.S. at 154, 124 S.Ct. 619. The Court expressly based its conclusion on the “close relationship between federal officeholders and the national parties, as well as the means by which parties have traded on that relationship....” Id.[12]
*14 Unlike the political parties examined in McConnell, there is no record evidence that non-profit entities have sold access to federal candidates and officeholders in exchange for large contributions. See also Craig Holman, The Bipartisan Campaign Reform Act: Limits and Opportunities for Nom-Profit Groups in Federal Elections, 31 N. Ky. L.Rev. 243, 280 (2004) (“Today’s electioneering non-profit groups ... can make no such promises of access in exchange for a soft money contribution.”).
More fundamentally, non-profit groups do not have the same inherent relationship with federal candidates and officeholders that political parties do. The McConnell Court identified numerous “real-world differences between political parties and interest groups.” 540 U.S. at 188, 124 S.Ct. 619. “Interest groups do not select slates of candidates for elections. Interest groups do not determine who will serve on legislative committees, elect congressional leadership, or organize legislative caucuses. Political parties have influence and power in the Legislature that vastly exceeds that of any interest group. As a result, it is hardly surprising that party affiliation is the primary way by which voters identify candidates, or that parties in turn have special access to and relationships with federal officeholders.” Id. As noted in McConnell, Congress recognized these differences and enacted a statutory scheme under which “[ijnterest groups ... remain free to raise soft money to fund voter registration, GOTV activities, mailings,” and advertising. Id. at 187, 124 S.Ct. 619.
In sum, it will not work to simply transport McConnell’s holding from the political party context to the non-profit setting. On this question as well, we agree with Judge Wilkinson: “It is ... not an exaggeration to say that McConnell views political parties as different in kind than independent expenditure committees.” N.C. Right to Life, 525 F.3d at 293.
For non-profit entities, the most pertinent Supreme Court precedents remain Buckley, Cal-Med, Citizens Against Rent Control, NCPAC, and MCFL. As discussed above, those cases ultimately stand for the proposition that non-profit groups may accept unlimited donations to their soft-money accounts. And subject to the one Austin-based exception, non-profit groups— like individual citizens — may spend unlimited amounts out of their soft-money accounts for election-related activities such as advertisements, get-out-the-vote efforts, and voter registration drives.[13]
*15 in
We now consider whether the 2004 FEC regulations at issue in this case comport with the relevant constitutional principles. They do not.
The fundamental flaw, as counsel for EMILY’s List succinctly stated at oral argument, is that the Commission improperly “brought to bear what was essentially a political party analysis to a non-connected, independent committee which is not under the control of, or associated with candidates in the fashion of a political party.” Tr. of Oral Arg. at 4.
A
The rules set forth in §§ 106.6(c), 106.6(f), and 100.57 contain five relevant provisions. In our judgment, the provisions are not closely drawn to meet an important governmental interest.[14]
*16 Under the Supreme Court’s precedents, non-profit entities may be required to use their hard-money accounts for their own contributions to candidates and parties and for an appropriately tailored share of administrative expenses associated with such contributions. But as explained above, non-profits may not be forced to use their hard-money accounts for expenditures such as advertisements, get-out-the-vote efforts, and voter registration drives. Non-profits — like individual citizens — are entitled to spend and raise unlimited money for those activities. The FEC’s five new regulatory provisions flout those principles.
First, the regulations require covered[15] non-profit entities to use their hard-money accounts to pay at least 50% of the costs of then- generic get-out-the-vote efforts and voter registration activities. 11 C.F.R. § 106.6(c). By “generic,” the regulations mean those activities that refer to a party but do not promote or oppose a particular candidate. See id. § 100.25. This provision violates the First Amendment because non-profits are constitutionally entitled to pay 100% of the costs of such voter drive activities out of their soft-money accounts. See Cal. Med. Ass’n v. FEC, 453 U.S. 182, 203, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (opinion of Blackmun, J.); see also FEC v. Mass. Citizens for Life, Inc. (MCFL), 479 U.S. 238, 259-63, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986); FEC v. Nat’l Conservative PAC (NCPAC), 470 U.S. 480, 501, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985); Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 298-99, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981); Buckley v. Valeo, 424 U.S. 1, 45-48, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).
*17 Second, the regulations mandate that covered non-profits use their hard-money accounts for 50% of any generic communications that refer to a party without referring to a candidate, for example, “Support the Democratic party.” 11 C.F.R. § 106.6(c). This provision likewise violates the First Amendment because non-profits are constitutionally entitled to pay 100% of the costs of such communications out of their soft-money accounts. See Cal-Med, 453 U.S. at 203, 101 S.Ct. 2712 (opinion of Blackmun, J.); see also MCFL, 479 U.S. at 259-63, 107 S.Ct. 616; NCPAC, 470 U.S. at 501, 105 S.Ct. 1459; Citizens Against Rent Control, 454 U.S. at 298-99, 102 S.Ct. 434; Buckley, 424 U.S. at 45-48, 96 S.Ct. 612.
Third, the regulations direct covered non-profit entities to use their hard-money accounts to pay at least 50% of all administrative expenses. 11 C.F.R. § 106.6(c). Those administrative expenses include rent, utilities, office supplies, and salaries, among other costs. But a nonprofit may be forced to use hard money for, at most, a percentage of administrative expenses that “closely” corresponds to the percentage of activities relating to its contributions as compared to its advertisements, get-out-the-vote efforts, and voter registration activities. See Davis v. FEC, — U.S.-, 128 S.Ct. 2759, 2770, 171 L.Ed.2d 737 (2008) (campaign finance regulations must at least be “closely drawn” to further an important governmental interest); Cal-Med, 453 U.S. at 198-99 n. 19, 101 S.Ct. 2712 (opinion of Marshall, J.) (rejecting argument that non-profit was entitled to pay its “entire ” administrative expenses with unlimited donations or soft-money account) (emphasis added). The tailoring must ensure that a hybrid non-profit is not unduly advantaged as compared to a non-profit that makes only contributions (and thus must fund certain administrative expenses with hard money) and is not unduly disadvantaged as compared to a non-profit that makes only expenditures (and thus may fund its administrative expenses with soft money). Section 106.6(c) does not attempt or purport to allocate administrative expenses in that way. And the “desire for a bright-line rule ... hardly constitutes the compelling state interest necessary to justify any infringement on First Amendment freedom.” FEC v. Wis. Right to Life, Inc. (WRTL), 551 U.S. 449, 479, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (internal quotation marks omitted) (controlling opinion of Roberts, C.J.).
Fourth, the regulations compel covered non-profit entities to use their hard-money accounts to pay 100% of the costs of advertisements or other communications that “refer” to a federal candidate. 11 C.F.R. § 106.6(f)(1). If an advertisement or communication refers to a state candidate as well as a federal candidate, the non-profit must pay for it with a percentage of its hard-money account as determined by time and space allocation. See id. § 106.6(f)(3). Here again, the problem is that non-profits are constitutionally entitled to pay 100% of the costs of their advertisements and other communications out of a soft-money account. See MCFL, 479 U.S. at 251, 107 S.Ct. 616; NCPAC, 470 U.S. at 501, 105 S.Ct. 1459; Citizens Against Rent Control, 454 U.S. at 299, 102 S.Ct. 434; Cal-Med, 453 U.S. at 203, 101 S.Ct. 2712 (opinion of Blackmun, J.); Buckley, 424 U.S. at 45-48, 96 S.Ct. 612.
Fifth, the regulations create a new regime for solicitations indicating that donated funds will be used to support or oppose the election of a clearly identified federal candidate. 11 C.F.R. § 100.57. The regulations require that donations in response to such solicitations be treated as *18 100% hard money. Id. § 100.57(a)-(b)(l). This means that donations in -response to such solicitations are subject to a $5000 cap. If a solicitation also refers to a state or local candidate, at least 50% of the responsive donations must go to the hard-money account. Id. § 100.57(b)(2). This provision is badly flawed. Non-profits are entitled to raise money for their soft-money accounts to help support their preferred candidates, yet this regulation prohibits non-profits from saying as much in their solicitations. “Such notions run afoul of the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message.” WRTL, 551 U.S. at 477 n. 9, 127 S.Ct. 2652 (internal quotation marks omitted); Davis, 128 S.Ct. at 2771 (provision that requires choice between “unfettered political speech” and “discriminatory fundraising limitations” violates First Amendment).
B
In short, the new FEC regulations do not pass muster under the Supreme Court’s First Amendment precedents. The regulations are not “closely drawn” to serve a cognizable anticorruption interest. See Davis, 128 S.Ct. at 2770-71; WRTL, 551 U.S. at 478-80, 127 S.Ct. 2652; NCPAC, 470 U.S. at 496-97, 105 S.Ct. 1459; Citizens Against Rent Control, 454 U.S. at 296-97, 102 S.Ct. 434; Buckley, 424 U.S. at 26-27, 45-48, 96 S.Ct. 612. Donations to and spending by a non-profit cannot corrupt a candidate or officeholder, at least in the absence of some McConnell-like evidence establishing such corruption or the appearance thereof. See N.C. Right to Life, Inc. v. Leake, 525 F.3d 274, 292-93 (4th Cir.2008); see also Richard Briffault, The 527 Problem and the Buckley Problem, 73 Geo. Wash. L.Rev. 949, 999 (2005) (“The 527s do not fit easily within Buckley’s anticorruption paradigm, at least as the Supreme Court has defined corruption until now.”); Gregg D. Polsky & Guy-Uriel E. Charles, Regulating Section 527 Organizations, 73 Geo. Wash. L.Rev. 1000, 1027-35 (2005).
Of course, the fact that the regulations do not serve a cognizable anti-corruption interest is not surprising because the decision to more tightly regulate entities like EMILY’s List arose out of an entirely different concern: the influence of nonprofits that raise and spend large amounts of money and thereby affect federal elections. See, e.g., Comments of Democracy 21, Campaign Legal Center & Center for Responsive Politics in Response to Notice of Proposed Rulemaking, No.2004-6, at 1-2 (Apr. 5, 2004) (criticizing “the spending of tens of millions of dollars of soft money explicitly for the purpose of influencing the presidential election by section 527 groups”). Responding to such complaints, the FEC adopted these new regulations to tamp down spending by non-profits and thereby better equalize the voices of citizens and groups who participate in the political process. Large donations to and spending by non-profits prompted these regulations, and limiting non-profits’ expenditures is their intended and predictable effect.
But the Supreme Court’s First Amendment eases have repeatedly repudiated this equalization rationale as a basis for regulating campaign-related contributions or expenditures. See Davis, 128 S.Ct. at 2773; Buckley, 424 U.S. at 48-49, 96 S.Ct. 612. Under current law, therefore, these regulations are unsupportable. The concern with “large individual donations to the 527s is that they permit a tiny group of Americans — the wealthiest ... — to play an enormous role in the electoral process.... Buckley, however, rejected the protection of political equality as a basis for limiting *19 the role of money in election campaigns.” Briffault, 73 Geo. Wash. L.Rev. at 954 (internal quotation marks omitted).
As a lower court, we must strictly adhere to the Supreme Court’s precedents. The regulations contravene the First Amendment as it has been interpreted thus far by the Supreme Court.[16]
C
As some commentators point out, it might seem incongruous to permit nonprofits to receive and spend large soft-money donations when political parties and candidates cannot. See Samuel Issacharoff & Pamela S. Karlan, The Hydraulics of Campaign Finance Reform, 77 Tex. L.Rev. 1705, 1715 (1999). But this perceived anomaly has existed to some extent since Buckley, which recognized that contribution limitations “alone would not reduce the greater potential voice of affluent persons and well-financed groups, who would remain free to spend unlimited sums directly to promote candidates and policies they favor in an effort to persuade voters.” Buckley, 424 U.S. at 26 n. 26, 96 S.Ct. 612. And McConnell similarly took note of the fact that, even after that decision upholding regulations on contributions to parties, “[i]nterest groups ... remain free to raise soft money to fund voter registration, GOTV activities, mailings,” and advertisements. McConnell v. FEC, 540 U.S. 93, 187, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003).
If eliminating this perceived asymmetry is deemed necessary, the constitutionally permitted legislative solution, as the Court stated in an analogous situation in Davis, is “to raise or eliminate” limits on contributions to parties or candidates. 128 S.Ct. at 2774. But it is not permissible, at least under current Supreme Court precedents, to remove the incongruity by placing these limits on spending by or donations to nonprofits.
IV
In addition to its First Amendment challenge to the five regulatory provisions, EMILY’s List alternatively contends that three of the five provisions exceed the FEC’s statutory authority. See 5 U.S.C. § 706(2)(C) (agency may not act “in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.”). We agree.
When enacting BCRA in 2002, Congress did not authorize the FEC to restrict donations to or spending by nonprofits — even though Congress was aware that BCRA’s restrictions on political parties meant that independent non-profit groups would become more influential in the electoral process. Indeed, Senator Lieberman, speaking in the Senate at the time, anticipated that “at least some of the soft money donors who will no longer be able to give to political parties will be looking for other ways to influence our elections. Donations to 527 groups will probably top many of their lists.” 148 CONG. REC. S10779 (daily ed. Oct. 17, 2002) (statement of Sen. Lieberman). He was right. Yet in the seven years since BCRA was enacted, Congress still has not imposed limits on non-profits, apparently because of continuing constitutional and policy concerns about regulating them in such a manner.
The statutory question, therefore, is whether the FEC’s authority under the long-standing Federal Election Campaign Act justifies the challenged regulations.
*20 Under FECA, the FEC’s authority extends only to regulating donations and expenditures made “for the purpose of influencing any election for Federal office.” 2 U.S.C. § 431(8)(A)(i). As the Supreme Court has explained, “[d]onations made solely for the purpose of influencing state or local elections are therefore unaffected by FECA’s requirements and prohibitions.” McConnell v. FEC, 540 U.S. 93, 122, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003).
Under FECA, in other words, the FEC possesses statutory authority to require a non-profit to use its hard-money account to pay for federal activities, generic activities, and mixed federal-state-local activities. See id. at 122-23, 124 S.Ct. 619.[17] But the FEC exceeds its statutory authority when it requires non-profits to use hard money for exclusively state and local election activities. See id. at 122, 124 S.Ct. 619; Chevron USA, Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (step one).
The three regulatory provisions that EMILY’s List challenges under FECA cross the statute’s boundaries.
EMILY’s List targets one of the provisions in § 106.6(c) as exceeding the FEC’s statutory authority — namely, the part requiring covered non-profits to use their hard-money accounts to pay for 50% of their administrative expenses. This requirement applies even if more than 50% of a nonprofit’s administrative expenses are exclusively associated with state and local elections. That poses a problem because the FEC possesses no authority under FECA to require nonprofits to use their hard-money accounts for their exclusively state and local election activities. We thus concur with EMILY’s List that this provision is overbroad and “federalizes the funding and reporting of a large portion of such a committee’s nonfederal receipts and disbursements, which are not made for the purpose of influencing federal elections.” EMILY’s List Br. at 39.[18]
Next, EMILY’s List argues that § 106.6(f) exceeds the FEC’s statutory authority. Recall that this provision requires covered non-profits to use hard money for all or part of their public communications that merely “refer” to federal candidates. See 11 C.F.R. 106.6(f). The FEC runs roughshod over the limits on its statutory authority when it presumes that any public communications that merely “refer” to a federal candidate necessarily seek to influence a federal election.[19]
*21 For example, § 106.6(f) would compel a covered nonprofit to use some hard money to pay for an advertisement running only in California in which Senator Jones from Maine endorses Candidate Smith for Governor of California. The sole purpose of such an advertisement is to influence the state election in California — a matter entirely outside the FEC’s statutory authority.
An incident illustrating § 106.6(f)’s statutory flaws occurred in 2005. EMILY’s List sought to run advertisements featuring Senator Stabenow in order to support Democratic women candidates for state legislative offices. At the time, Senator Stabenow was a candidate for reelection to the U.S. Senate in Michigan. EMILY’s List represented that the communication would not be distributed in Michigan, would not reference Senator Stabenow’s federal candidacy, would not solicit funds for her federal candidacy, and would not refer to any clearly identified non-federal candidate. Rather, it would support non-federal Democratic women candidates as a class. Nonetheless, the FEC determined that the mere reference to Senator Stabenow meant that EMILY’s List had to pay for the communications with 100% hard money. See FEC Adv. Op.2005-13, at 3-4 (Oct. 20, 2005).
Finally, EMILY’s List argues that the solicitation rule set forth in § 100.57 also exceeds the FEC’s statutory power. We agree. To reiterate, § 100.57 requires covered non-profits to treat as hard-money “contributions” all funds given in response to solicitations indicating that “any portion” of the funds received will be used to support or oppose the election of a federal candidate. 11 C.F.R. §§ 100.57(a)-(b)(l) (emphasis added). If the communication indicates that the funds will support or oppose both a federal and non-federal candidate, then at least 50% of those funds must be treated as hard money. See id. § 100.57(b)(2). The statutory defect in the rule is that, depending on the particular solicitation at issue, it requires covered non-profits to treat as hard money certain donations that are not actually made “for the purpose of influencing” federal elections.
Consider a fundraising pitch in which a non-profit such as EMILY’s List tells donors that only 10% of their gift will be used to support identified federal candidates, with the rest to exclusively support state and local candidates. Each donor fully and correctly understands that only a small portion of his or her gift will be used “for the purpose of influencing” federal elections. And yet, § 100.57 requires that at least 50% of donations in response to such a solicitation be classified as a hard-money donation subject to the $5000 cap— thereby simultaneously creating a separate $5000 cap on soft-money donations given in response to such a solicitation. This may require a non-profit to decline or return funds it receives for purely state and local elections. That is not permissible under FECA.
In short, there is a significant mismatch between these challenged provisions and the FEC’s authority under FECA. Therefore, we conclude that §§ 106.6(f) and 100.57, as well as the provision in § 106.6(c) that applies to administrative *22 expenses, exceed the FEC’s statutory authority.[20]
V
Before concluding, we add a few words regarding the concurring opinion.
To begin, it is important to emphasize the area of agreement between the opinion of the Court and the concurrence. All three judges on the panel have determined that §§ 106.6(c), 106.6(f), and 100.57 are unlawful and must be vacated.
The concurrence advances two main points: (i) that under McConnell, the Federal Government constitutionally may regulate non-profits like political parties; and (ii) that we should not address the First Amendment issue in this case. Neither argument is convincing.
First, the concurrence contends that “regulation of political parties is not McConnell’s theme,” and it reads McConnell to support regulation not only of political parties but also of independent nonprofit groups. Concurring Op. at 34. As we have explained at length above, we do not find that a persuasive interpretation of McConnell. In upholding Title I of BCRA, the McConnell Court relied heavily on the “unity of interest,” “close relationship,” and “close ties” among candidates, officeholders, and political parties. The concurrence identifies no similar unity of interest between non-profits, on the one hand, and candidates, officeholders, or parties on the other. The McConnell Court also based its decision on the substantial record evidence of parties selling access in exchange for soft-money contributions. The Court repeatedly emphasized that “Congress must show concrete evidence that a particular type of financial transaction is corrupting or gives rise to the appearance of corruption.... It has done so here.” McConnell, 540 U.S. at 185-86 n. 72, 124 S.Ct. 619. The concurrence cites no similar record evidence showing that nonprofits sell access to officeholders and candidates in exchange for large soft-money contributions.
In our judgment, “McConnell views political parties as different in kind than independent expenditure committees.” N.C. Right to Life v. Leake, 525 F.3d 274, 293 (4th Cir.2008). We therefore disagree with the concurrence’s attempt to stretch McConnell’s reasoning from political parties to nonprofits.[21]
*23 Relatedly, the concurrence disputes our reading of Cal-Med. See Concurring Op. at 37. But our analysis of that case, including our reliance on Justice Blackmun’s opinion, tracks the persuasive reasoning of the Fourth Circuit in North Carolina Right to Life, of several other courts, and of numerous commentators. See, e.g., N.C. Right to Life, 525 F.3d at 292; see also, e.g., Comm. on Jobs Candidate Advocacy Fund v. Herrera, No. C 07-03199, 2007 WL 2790351, *4 (N.D.Cal. Sept.20, 2007); Wash. State Republican Party v. Wash. State Pub. Disclosure Comm’n, 141 Wash.2d 245, 4 P.3d 808, 825 (2000); Richard Briffault, The 527 Problem and the Buckley Problem, 73 Geo. Wash. L.Rev. 949, 982-85 (2005); John C. Eastman, Strictly Scrutinizing Campaign Finance Restrictions (and the Courts that Judge Them), 50 Cath. U.L. Re. 13, 37 (2000); Gregg D. Polsky & Guy-Uriel E. Charles, Regulating Section 527 Organizations, 73 Geo. Wash. L.Rev. 1000, 1031 (2005). Moreover, the concurrence does not substantively address the several post-CaiMed cases that similarly recognize the right of non-profits to raise and spend money to support their agendas and preferred candidates. See, e.g., FEC v. Mass. Citizens for Life, Inc. (MCFL), 479 U.S. 238, 259-65, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986); FEC v. Nat’l Conservative PAC (NCPAC), 470 U.S. 480, 501, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985); Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 296-99, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981).
The concurrence further contends that we have not received on-point briefing on the constitutional issue. We again respectfully disagree. The briefs and oral argument focused first and most extensively on the First Amendment and McConnell — and debated the key question in this case: For First Amendment purposes, are non-profits more like individual citizens (who under Buckley have the right to spend unlimited money to support their preferred candidates) or more like political parties (which under McConnell do not)? See Buckley v. Valeo, 424 U.S. 1, 44-51, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); see also McConnell, 540 U.S. at 155-56, 124 S.Ct. 619. Moreover, Cal-Med was cited and discussed often in the briefs and at oral argument. See Tr. of Oral Arg. 17-18, 32-33; FEC Br. at 21, 27, 28, 34; Amicus Br. at 21, 24; EMILY’s List Reply Br. at 11, 19-20. Indeed, the FEC’s brief noted that Cal-Med was a case “chiefly relied upon.” FEC Br. at iv. In short, the briefs and oral argument focused on and grappled with the critical issues posed by the First Amendment challenge.
The concurrence suggests, however, that our holding goes further than the submission of EMILY’s List. But EMILY’s List forcefully argued that these regulations “violate the First Amendment of the United States Constitution,” contended that McConnell and Cal-Med do not support the FEC’s approach, and asked the Court to vacate the new regulations in their entirety. EMILY’s List Br. at 19. In decid *24 ing this case, we have set forth the relevant constitutional principles as we discern them, and we then have applied those principles to the challenged regulations. In so doing, we have concluded that the regulations violate the First Amendment; we therefore have vacated the regulations, which is precisely the relief EMILY’s List sought in advancing its First Amendment claims.
Second, apart from its substantive disagreement with our First Amendment analysis, the concurrence states that we should resolve this case on statutory grounds alone, and claims that it is “gratuitous” for us to address the First Amendment. We respectfully but firmly disagree.
The threshold problem with the concurrence’s preferred statutory-only approach is that EMILY’s List raises a statutory challenge to only three of the five provisions at issue here. EMILY’s List does not advance a statutory challenge to the provision in § 106.6(c) requiring that covered non-profits use their federal or hard-money accounts to pay for at least 50% of their generic get-out-the-vote and voter registration activities. Nor does EMILY’s List raise a statutory challenge to the provision in § 106.6(c) requiring that covered nonprofits use hard money to pay for at least 50% of their generic communications. Compare EMILY’s List Br. at 38-39 (discussing only administrative expenses provision of § 106.6(c) in statutory section of brief) with EMILY’s List Br. at 32 (raising constitutional challenges to all provisions of § 106.6(c)). Indeed, footnote 11 of EMILY’s List’s brief all but concedes that, under the statute, the FEC may require use of hard money for these generic activities.
EMILY’s List’s decision not to target these two provisions of § 106.6(c) on statutory grounds appears wise. Such an argument would be very difficult to square with McConnell’s several pointed statements that FECA permits the FEC to treat generic activities as entirely federal for purposes of contribution and expenditure limits. In fact, McConnell harshly criticized the FEC for not having previously treated political parties’ generic activities as entirely federal activities subject to FECA’s limits. See McConnell, 540 U.S. at 142, 124 S.Ct. 619 (by allowing generic activities to be funded largely with soft money, FEC’s allocation regime “subverted” original FECA scheme); id. at 167, 124 S.Ct. 619 (FECA scheme “eroded” by FEC’s allocation regime); see also id. at 142 n. 44, 124 S.Ct. 619.[22]
Under the circumstances, we have no choice but to address EMILY’s List’s First Amendment argument. The concurrence apparently wants us to address a statutory argument that EMILY’s List did not raise and then to accept that statutory claim even though we find it unpersuasive and inconsistent with precedent. We respectfully decline the concurrence’s proposal.[23]
*25 The FEC rules challenged by EMILY’s List— §§ 106.6(c), 106.6(f), and 100.57— violate the First Amendment. Sections 106.6(f) and 100.57 also exceed the FEC’s authority under the Federal Election Campaign Act, as does the provision of § 106.6(c) that applies to administrative expenses. The FEC may not enforce §§ 106.6(c), 106.6(f), or 100.57. We reverse the judgment of the District Court and direct it to enter judgment for EMILY’s List and to vacate the challenged regulations.

So ordered.

. A hard-money account is subject to source and amount limitations. For example, under the statute, EMILY’s List cannot accept donations of more than $5000 annually into its hard-money account from any single contributor. 2 U.S.C. § 441a(a)(l)(C). A soft-money account may receive unlimited donations.

. The Court’s rejection of the equalization argument is consistent with its broader First Amendment jurisprudence: "As a general matter, the American First Amendment tradition requires that the financial, political, or rhetorical imbalance between the proponents of competing arguments is insufficient to justify government intervention to correct that imbalance." Frederick Schauer & Richard H. Pildes, Electoral Exceptionalism and the First Amendment, 77 Tex. L.Rev. 1803, 1825 (1999); see generally Lillian R. BeVier, Money and Politics: A Perspective on the First Amendment and Campaign Finance Reform, 73 Cal. L.Rev. 1045 (1985).

. Contributions include coordinated expenditures — that is, expenditures coordinated with a candidate or party. See McConnell, 540 U.S. at 121, 124 S.Ct. 619; FEC v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 443, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001); see also 2 U.S.C. § 441 a(a)(7)(B).

. Many have criticized the distinction between contributions and expenditures because, in their view, they are "two sides of the same First Amendment coin.” Buckley, 424 U.S. at 241, 96 S.Ct. 612 (opinion of Burger, C.J.). Some contend that limits on contributions and expenditures are both suspect under the First Amendment. See id.; id. at 290, 96 S.Ct. 612 (opinion of Blackmun, J); see also Shrink Mo. Gov’t PAC, 528 U.S. at 410 (Thomas, J., dissenting). Others argue that the interest in limiting contributions similarly justifies restricting expenditures. See Buckley, 424 U.S. at 260-62, 96 S.Ct. 612 (opinion of White, J.). The Court thus far has rebuffed both critiques and adhered to the Buckley divide. See Randall, 548 U.S. at 242, 126 S.Ct. 2479 ("Over the last 30 years, in considering the constitutionality of a host of different campaign finance statutes, this Court has repeatedly adhered to Buckley’s constraints, including those on expenditure limits.”).

. The Court also has ruled that the Government may bar certain non-profit as well as for-profit corporations from making direct contributions to candidates or parties. See FEC v. Beaumont, 539 U.S. 146, 159-60, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003).

. The Supreme Court is presently considering whether to overrule Austin (and McConnell's reliance on it) to the extent Austin permitted the Government to limit for-profit corporations' and unions’ expenditures. See Citizens United v. FEC, No. 08-205 (S.Ct. reargued Sept. 9, 2009); cf. Austin, 494 U.S. at 702, 110 S.Ct. 1391 (Kennedy, J., dissenting) ("Today's decision abandons [Buckley’s] distinction and threatens once-protected political speech.”). The regulations at issue here violate the First Amendment with or without Austin on the books. See infra note 11.

. In referring to non-profit entities, we mean non-connected non-profit corporations (usually advocacy or ideological or politically oriented non-profits) that engage in election-related activities and register with the Internal Revenue Service under 26 U.S.C. § 527 or § 501(c), as well as unincorporated non-profit groups. "Non-connected” means that the non-profit is not a candidate committee, a party committee, or a committee established by a corporation or labor union. See 11 C.F.R. § 106.6(a). “Non-connected” for purposes of this opinion also excludes so-called leadership PACs.
Some non-profits register with the FEC as political committees; others do not. Our constitutional analysis of donations to and spending by non-connected non-profits applies regardless whether a non-profit has registered as a political committee with the FEC. See infra note 15.

. In Cal-Med, there was no majority opinion on the First Amendment issue. Under the Marks principle, Justice Blackmun’s opinion in Cal-Med appears to be controlling. See Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977); cf., e.g., Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 269-320, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.). Even if Justice Blackmun's opinion were not binding under the Marks principle or even if his discussion of expenditure-only nonprofits were considered dicta, his opinion’s principles have been followed in subsequent decisions such as Citizens Against Rent Control. In that regard, we note that Justice Marshall’s opinion in CalMed. did not decide how the First Amendment applies to contributions to a non-profit that only makes expenditures. See Cal-Med, 453 U.S. at 197 n. 17, 101 S.Ct. 2712 (opinion of Marshall, J.) ("American Civil Liberties Union suggests that § 441a(a)(1)(C) would violate the First Amendment if construed to limit the amount individuals could jointly expend to express their political views. We need not consider this hypothetical application....”).

. To be sure, some cases suggest that the First Amendment interest in donating to someone else for speech, while important, is less weighty than the First Amendment interest in speaking oneself. But those cases involve contributions to candidates or parties. See Buckley, 424 U.S. at 21, 96 S.Ct. 612. With respect to donations to groups other than candidates or political parties, the Court has said that there are "of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them.” Citizens Against Rent Control, 454 U.S. at 296, 102 S.Ct. 434; see also MCFL, 479 U.S. at 261, 107 S.Ct. 616; NCPAC, 470 U.S. at 495, 105 S.Ct. 1459; Cal-Med, 453 U.S. at 203, 101 S.Ct. 2712 (opinion of Blackmun, J.); NAACP, 357 U.S.at 460, 78 S.Ct. 1163.

. The requirement that certain administrative expenses be funded in part with hard money prevents a contributor from essentially taking control of a non-profit and thereby circumventing limits on individual contributions to candidates. See Cal-Med, 453 U.S. at 198-99 n. 19, 101 S.Ct. 2712 (opinion of Marshall, J.); id. at 203, 101 S.Ct. 2712 (opinion of Blackmun, J.). But as discussed above, the Cal-Med Court never stated that non-profits could be required to use hard money for advertisements, get-out-the-vote activities, and voter registration drives; indeed, Justice Blackmun’s opinion stated the opposite.

. One additional wrinkle: To the extent a non-profit receives donations from for-profit corporations or unions, those donations cannot be placed in the non-profit’s hard-money account (because for-profit corporate or union donations cannot be the source of contributions to parties or candidates). Moreover, under Austin, the soft-money account into which such donations are deposited cannot be used to fund express-advocacy election activi *13 ties that for-profit corporations and unions are themselves banned from conducting. Cf. WRTL, 551 U.S. at 476-77, 127 S.Ct. 2652; MCFL, 479 U.S. at 259-64, 107 S.Ct. 616; FEC v. NRA, 254 F.3d 173, 191-92 (D.C.Cir. 2001). Justice Souter recently summarized these points: A “nonprofit may use its general treasury to pay for clearly electioneering communications so long as it declines to serve as a conduit for money from business corporations and unions (and thus qualifies for the MCFL exception).” WRTL, 551 U.S. at 521, 127 S.Ct. 2652 (Souter, J., dissenting) (internal quotation marks omitted). If Austin were overruled, then non-profits would be able to make unlimited express-advocacy expenditures from their soft-money accounts even if they accepted donations from for-profit corporations or unions to those accounts.

. See generally McConnell, 540 U.S. at 130, 124 S.Ct. 619 ("both parties promised and provided special access to candidates and senior Government officials in exchange for large soft-money contributions”); id. at 145, 124 S.Ct. 619 ("special relationship and unity of interest” that candidates and officeholders share with parties); id. at 146, 124 S.Ct. 619 ("The evidence in the record shows that candidates and donors alike have in fact exploited the soft-money loophole, the former to increase their prospects of election and the latter to create debt on the part of officeholders, with the national parties serving as willing intermediaries.”); id. at 150, 124 S.Ct. 619 ("The record in the present cases is repíete with similar examples of national party committees peddling access to federal candidates and officeholders in exchange for large soft-money donations.”); id. at 151, 124 S.Ct. 619 ("So pervasive is this practice that the six national party committees actually furnish their own menus of opportunities for access to would-be soft-money donors, with increased prices reflecting an increased level of access.”); id. at 152, 124 S.Ct. 619 (“close ties that candidates and officeholders have with their parties”); id. at 153-54, 124 S.Ct. 619 (“As the record demonstrates, it is the manner in which parties have sold access to federal candidates and officeholders that has given rise to the appearance of undue influence.”); id. at 155, 124 S.Ct. 619 ("no meaningful separation between the national party committees and the public officials who control them”) (internal quotation marks omitted); id. ("Given this close connection and alignment of interests, large soft-money contributions to national parties are likely to create actual or apparent indebtedness on the part of federal officeholders”); id. ("This close affiliation has also placed national parties in a position to sell access to federal officeholders in exchange for soft-money contributions”); id. ("Access to federal officeholders is the most valuable favor the national party committees are able to give in exchange for large donations.”); id. at 156 n. 51, 124 S.Ct. 619 (“[T]he record demonstrates close ties between federal officeholders and the state and local committees of their parties. *14 That close relationship makes state and local parties effective conduits for donors desiring to corrupt federal candidates and officeholders. Thus, in upholding §§ 323(b), (d), and (f), we rely not only on the fact that they regulate contributions used to fund activities influencing federal elections, but also that they regulate contributions to, or at the behest of, entities uniquely positioned to serve as conduits for corruption.”).

. Some have suggested that footnote 48 of the McConnell opinion, in the course of discussing contributions to parties, subtly re-interpreted Cal-Med to permit restrictions on large soft-money donations to non-profits. See, e.g., Edward B. Foley & Donald Tobin, The New Loophole?: 527s, Political Committees, and McCain-Feingold, BNA Money & Pol. Rep., Jan. 7, 2004; Memorandum from Prof. Daniel R. Ortiz, Univ. of Va. School of Law, to Democracy 21 and the Campaign Legal Center (Apr. 9, 2004). We decline to adopt that expansive reading of footnote 48.
First, as explained by one leading election-law expert, such a reading would require overruling the Supreme Court's longstanding dichotomy between limits on contributions and expenditures. See Richard L. Hasen, Buckley is Dead, Long Live Buckley, 153 U. Pa. L.Rev. 31, 70 (2004). Limits on donations to non-profit entities are analytically akin to limits on expenditures by the donors. See Cal-Med, 453 U.S. at 202, 101 S.Ct. 2712 (opinion of Blackmun, J.); see also Briffault, 73 Geo. Wash L.Rev. at 982 (“[I]f George *15 Soros's direct expenditure of $23 million on anti-Bush or pro-Kerry ads is constitutionally protected, how does he forfeit that protection if he combines his $23 million with $20 million from Peter Lewis and maybe another $10 million from some slightly smaller fry in a fund that takes out essentially the same ads and supports the same voter drives?”). For that reason, a broad interpretation of footnote 48 would mean "the entire Buckley edifice ... falls.” Hasen, 153 U. Pa. L.Rev. at 70. "Is that what the Court really intended buried in a few sentences of a footnote in one of the longest cases in Supreme Court history?” Id. We think not.
Second, footnote 48 simply cited Cal-Med together with Buckley in the course of establishing the constitutionality of limits on contributions to political parties, not to non-profits (which the Court had no need to address). In the key concluding sentence in the footnote, the Court rejected the idea that the government could only regulate "parties as pass-throughs.” McConnell, 540 U.S. at 152 n. 48, 124 S.Ct. 619 (emphasis added). Moreover, footnote 48 was responding to a point in Justice Kennedy's dissent that had nothing to do with non-profits. See Briffault, 73 Geo. Wash. L.Rev. at 986 (“importantly, the McConnell footnote was written in the course of the Court's analysis of BCRA's application of contribution limits to the activities of political parties”). We would unfairly wrench footnote 48 from its context were we to adopt the broad interpretation some have proposed.
Third, in a later passage in the McConnell opinion, the Court explained that, under the statute, "[ijnterest groups ... remain free to raise soft money to fund voter registration, GOTV activities, mailings,” and advertisements. 540 U.S. at 187, 124 S.Ct. 619. That passage — and the accompanying discussion — • would make little sense if footnote 48 were read to equate non-profits with political parties.
Fourth, the Fourth Circuit in North Carolina Right to Life refused to adopt this broad reading of footnote 48; it eschewed the dissenting judge's extensive reliance on it. See 525 F.3d at 333-34 (Michael, J., dissenting).
In short, we decline to read this footnote addressing a different issue in McConnell to indirectly (i) overrule Buckley, (ii) discard Justice Blackmun’s opinion in Cal-Med, and (iii) equate non-profits with political parties, contrary to other discussion in McConnell.

. We need not decide whether the regulations are subject to the strictest scrutiny applicable to spending restrictions or the still "rigorous” but slightly lesser "closely drawn” scrutiny applicable to contribution restrictions. See generally Davis v. FEC, - U.S. -, 128 S.Ct. 2759, 2770-72, 171 L.Ed.2d 737 (2008); FEC v. Wis. Right to Life, Inc. (WRTL), 551 U.S. 449, 464, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007); Buckley v. Valeo, 424 U.S. 1, 29, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Under either permutation of this "exacting” scrutiny, Buckley, 424 U.S. at 16, 96 S.Ct. 612, the regulations violate the First Amendment. That said, the allocation and "mere reference” regulations of §§ 106.6(c) and 106.6(f) are best considered spending restrictions under the analysis set forth in Wisconsin Right to Life. 551 U.S. at 457, 477 n. 9, 478-79, 127 S.Ct. 2652; see also Cal. Med. Ass'n v. FEC, 453 U.S. 182, 203, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (opinion of Blackmun, J.) (limits on donations to nonprofits subject to strict scrutiny). In Wisconsin Right to Life, the Court indicated that forcing an entity to spend out of a segregated fund subject to source and amount limitations, rather than its general treasury, was a spending restriction. 551 U.S. at 477 n. 9, *16 127 S.Ct. 2652. So too here. Unlike BCRA’s rules for political parties, moreover, these regulations do not limit how much someone can contribute to EMILY's List or other covered non-profits. Rather, these regulations force non-profit entities to pay for a large percentage of their varied political activities out of hard-money accounts subject to source and amount ($5000) limits rather than out of soft-money accounts that may receive unlimited donations. Through this mechanism, the regulations limit how much non-profits ultimately can spend on advertisements, get-out-the-vote efforts, and voter registration drives. These regulations therefore “reduce!] the quantity of expression” for groups like EMILY's List “by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.” Buckley, 424 U.S. at 19, 96 S.Ct. 612. As a rough analogy, consider a law that requires home buyers to pay a 50% cash down payment to obtain a mortgage. That kind of law would significantly limit how much buyers could afford to spend for a new house. A similar dynamic is at play as a result of these regulations.

. The regulations apply only to those nonprofits that must register with the FEC as political committees — namely, groups that receive or spend more than $1000 annually for the purpose of influencing a federal election and whose "major purpose” involves federal elections. Buckley, 424 U.S. at 79, 96 S.Ct. 612; see 2 U.S.C. §§ 431-434, 441a; supra note 7. Our constitutional analysis of donations and spending limits applies both to non-connected non-profits registered as political committees with the FEC and to non-connected non-profits that are not so registered. The fact that a non-profit spends a certain amount or percentage of its money in relation to federal elections cannot be a basis, at least under the anti-corruption rationale, for restricting its ability to accept large donations to support those expenditures. That conclusion follows from the Supreme Court’s consistent holdings that large expenditures are constitutionally protected and the corresponding principle that non-profits are constitutionally entitled to accept large donations to their soft-money accounts to support advertisements, get-out-the-vote efforts, and voter registration activities. Of course, because of the lesser First Amendment protection against disclosure, the major purpose test is permissible under current precedent for determining non-profits' disclosure obligations. See Buckley, 424 U.S. at 79, 96 S.Ct. 612.

. This case does not involve reporting and disclosure obligations. The Government has a freer hand in imposing reporting and disclosure requirements than it does in limiting contributions and expenditures. See McConnell v. FEC, 540 U.S. 93, 121-22, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003); Buckley, 424 U.S. at 64-68, 96 S.Ct. 612.

. As explained earlier in this opinion, those approaches run into severe First Amendment obstacles. For purposes of this discussion, however, we analyze the statute as written without regard to constitutional implications.

. As discussed above, § 106.6(c) also requires non-profits to use their federal or hard-money accounts to pay for (i) at least 50% of their generic get-out-the vote and voter registration activities and (ii) at least 50% of their generic communications, which refer to a party but not a candidate. In its brief, EMILY’s List does not raise statutory challenges to those two provisions. See EMILY’s List Br. at 35-40; id. at 38 (challenging under the statute only that provision in § 106.6(c) that sets forth a " ‘Minimum Percentages' Rule for Administrative Costs”). Presumably, EMILY’s List has not challenged these two provisions under FECA because McConnell indicated that these generic activities qualify under the statute as activities and communications "for the purpose of influencing” federal elections. See McConnell, 540 U.S. at 123, 124 S.Ct. 619 ("Although a literal reading of FECA’s definition of ‘contribution’ would have required such activities to be funded with hard money, the FEC ruled that political parties could fund mixed-purpose activities — including get-out-the-vote drives and generic party advertising — in part with soft money.’’) (emphasis added).

. The original FEC proposal was far narrower and would have covered only communica *21 tions that promote, attack, support, or oppose federal candidates, similar to BCRA's requirement for state and local parties. See 69 Fed. Reg. at 11,753, 11,757-11,758 (Mar. 11, 2004) (notice of proposed rulemaking). After initially considering that limited proposal, the FEC ultimately decided to regulate broadly and to saddle non-profits with even greater restrictions than Congress in BCRA chose to impose on state and local parties.

. EMILY’s List separately argues that three of the five regulatory provisions at issue in this case are also arbitrary and capricious under the Administrative Procedure Act. EMILY’s List Br. at 40-44. We are less persuaded by EMILY’s List’s freestanding arbitrary and capricious argument. Putting aside the constitutional and statutory-authority problems with the challenged rules, the provisions are not otherwise arbitrary and capricious. Agencies generally do not violate the APA’s deferential arbitrary-and-capricious standard when they employ bright-line rules for reasons of administrative convenience, so long as those rules fall within a zone of reasonableness and are reasonably explained. See, e.g., ExxonMobil Gas Mktg. Co. v. FERC, 297 F.3d 1071, 1084 (D.C.Cir.2002); WorldCom, Inc. v. FCC, 238 F.3d 449, 461-62 (D.C.Cir.2001).
EMILY’s List does not bring a challenge under either FECA or the APA to § 106.6(c)'s requirement that covered non-profits pay at least 50% of the cost of their generic communications out of their hard-money accounts. See EMILY's List Br. at 35-44. EMILY’s List raises only a constitutional challenge to that provision.

. The concurrence notes that McConnell upheld § 323(f) of BCRA, which prohibits state and local candidates and officeholders from using soft money for communications that promote, support, attack, or oppose a federal candidate. We fail to see how this aspect of McConnell justifies upholding limits on nonprofits. McConnell, as we read it, relied in part on the fact that officeholders, candidates, and parties at all levels share a close relationship and apparent unity of interest. And the *23 Court also based its conclusion with respect to state and local candidates and officeholders — as elsewhere — on “the record in this litigation,” 540 U.S. at 185, 124 S.Ct. 619, emphasizing that "Congress must show concrete evidence that a particular type of financial transaction is corrupting or gives rise to the appearance of corruption.... It has done so here." Id. at 185-86 n. 72, 124 S.Ct. 619.
The concurrence also raises concern about the activities of non-profit committees that are “closely aligned” with federal candidates. Concurring Op. at 36-37. But our constitutional analysis of non-profits applies only to non-connected non-profits. See 11 C.F.R. § 106.6(a); supra note 7. Moreover, expenditures by individuals or non-profits that are coordinated with a candidate may be considered contributions to that candidate.

. The concurrence finds "perplexing[ ]" our reading of McConnell's statutory discussion. Concurring Op. at 30. We think it's straightforward. McConnell said the statutory phrase "for the purpose of influencing” federal elections covers generic activities. McConnell, 540 U.S. at 167, 124 S.Ct. 619. That seems to foreclose any statutory challenge to the new regulatory provisions applicable to generic activities. But that of course does not resolve EMILY's List's constitutional challenge.

. Even if EMILY’s List had put forward meritorious statutory challenges to all of the regulatory provisions that it has challenged under the First Amendment, we still would possess discretion to rule in the alternative on both statutory and constitutional grounds. The avoidance principle cited by the concurrence is prudential, not jurisdictional. And it is not *25 uncommon for lower courts to rule on alternative statutory and constitutional grounds when appropriate. See, e.g., United States v. Thomas, 572 F.3d 945, 949-51 (D.C.Cir.2009); Time Warner Entm't Co., L.P. v. ECC, 240 F.3d 1126, 1128 (D.C.Cir.2001); see generally Richard H. Fallon, Jr. & Daniel J. Meltzer, New Law, Non-Retroactivity, and Constitutional Remedies, 104 Harv. L.Rev 1731, 1801 (1991) ("Simply as a routine matter, the Supreme Court, in common with the lower federal courts, may choose to discuss either or both of alternative grounds for reaching a decision.”).
Given that the complaint in this case was filed four and a half years ago, that the parties and the District Court overwhelmingly focused their attention on the constitutional issue, that resolution of the case only on statutory grounds would not alleviate the continuing legal uncertainty, and that this is an area of law demanding prompt and clear judicial decisionmaking, it would not be an inappropriate exercise of judicial discretion for an intermediate court to resolve this case on alternative constitutional and statutory grounds.
In any event, we need not cross that discretionary bridge here because, as we have explained, we must address the Constitution's application to non-profits' election-related spending and fundraising in order to resolve the appeal.