**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 18, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

REPUBLICAN PARTY OF NEW
MEXICO; REPUBLICAN PARTY OF
BERNALILLO COUNTY;
REPUBLICAN PARTY OF DONA
ANA COUNTY; NEW MEXICO
TURN AROUND; NEW MEXICANS
FOR ECONOMIC RECOVERY PAC;
HARVEY YATES; ROD ADAIR;
CONRAD JAMES; HOWARD JAMES
BOHLANDER; MARK VETETO,

        Plaintiffs-Appellees,

v.

GARY K. KING, in his official
capacity as New Mexico Attorney
General; KARI E. BRANDENBURG;
JANETTA HICKS; ANGELA R.
PACHECO, in their official capacities
as District Attorneys,

        Defendants-Appellants.

and

DIANNA J. DURAN, in her official
capacity as New Mexico Secretary of
State; AMY ORLANDO, in her
official capacity as District Attorney,

        Defendants.

No. 12-2015

------------------------------

STATE OF VERMONT; STATE OF
HAWAII; STATE OF IOWA; STATE
OF MONTANA; STATE OF RHODE
ISLAND; STATE OF WEST
VIRGINIA,

Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 1:11-CV-00900-WJ-KBM)**

---

Phillip Baca, Assistant Attorney General (Gary K. King, Attorney General, with
him on the briefs) Office of the Attorney General, Albuquerque, New Mexico, for
Appellants.

Randy Elf, James Madison Center for Free Speech, Terre Haute, Indiana (James
Bopp, Jr., James Madison Center for Free Speech, Terre Haute, Indiana, and Paul
M. Kienzle III, Scott & Kienzle, P.A., Albuquerque, New Mexico, with him on
the brief) for Appellees.

William H. Sorrell, Attorney General of Vermont, and Eve Jacobs-Carnahan,
Assistant Attorney General of Vermont, Montpelier, Vermont, David M. Louie,
Attorney General of Hawaii, Honolulu, Hawaii, Steve Bullock, Attorney General
of Montana, Helena, Montana, Darrell V. McGraw, Jr., West Virginia Attorney
General, Office of the Attorney General, Charleston, West Virginia, Tom Miller,
Attorney General of Iowa, Des Moines, Iowa, and Peter F. Kilmartin, Attorney
General, State of Rhode Island, Providence, Rhode Island, filed an Amici brief on
behalf of Appellants.

---

Before **TYMKOVICH**, **McKAY**, and **O'BRIEN**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

This case requires us to consider state campaign finance regulations in light of the Supreme Court's ruling in *Citizens United v. FEC*, 558 U.S. 310 (2010). *Citizens United* held that federal election law violated the First Amendment by restricting independent political spending because the speaker was a corporation—the holding allowed corporate entities to make unlimited independent expenditures supporting or opposing issues or candidates as long as the expenditures were not coordinated with a candidate for federal office.

Before the Court's decision in *Citizens United* in 2010, however, New Mexico had introduced a new state campaign finance law that imposed a host of contribution and other limitations on political parties, political action committees, and donors to such entities. In particular for purposes of this appeal, the state limited the amount an individual may contribute to a political committee. Potential donors, political parties, and political committees mounted an as-applied challenge to the law in federal district court, contending several of its provisions violated the First Amendment.

The district court agreed and issued a preliminary injunction, enjoining the enforcement of two provisions: (1) limits on contributions to political committees for use in federal campaigns, and (2) limits on contributions to political committees that are to be used for independent expenditures, *i.e.*, expenditures not authorized by or coordinated with a candidate or candidate committee. *See Republican Party of N.M. v. King*, 850 F. Supp. 2d 1206, 1216 (D.N.M. 2012).

New Mexico appealed the latter ruling, contending that the limit on contributions furthers the state's compelling interest in preventing corruption or the appearance of corruption in campaign spending.

As we explain below, the district court was correct that the challenged provision cannot be reconciled with *Citizens United* and, as a result, did not err in entering a preliminary injunction.

# I. Background

New Mexico enacted in 2009 a measure that imposed campaign contribution limits for statewide and nonstatewide elections. New Mexico's law, N.M. Stat. § 1-19-34.7, targets contributions to political committees and candidates in several ways.

The statute caps contributions from individuals to political committees at $5,000, contributions to candidates for nonstatewide office at $2,300, and contributions to candidates for statewide office at $5,000. *Id.* § 1-19-34.7(A)(1).[1]

---

[1] The relevant section of the statute is as follows:

A.  The following contributions by the following persons are prohibited:
    (1) from a person, not including a political committee, to a:
        (a) . . . .
        (b) . . . .
        (c) political committee in an amount that will cause that person's total contributions to the political committee to exceed five thousand dollars ($5,000) during a primary election or five thousand dollars ($5,000) during a general election

(continued...)

The statute also prohibits accepting or soliciting a contribution that violates one of these limits. *Id.* § 1-19-34.7(C). Though "political committee" is defined broadly to include political parties, *id.* § 1-19-26(L), in this case only non-party political committees have challenged the constitutionality of the law as applied to them. Both groups want to solicit and accept contributions for independent expenditures in excess of the statutory maximum of $5,000. New Mexico defends the law on the grounds that Supreme Court precedent permits restrictions for contributions and such restrictions further the state's anti-corruption interests. The appellees contend that *Citizens United* changes the analysis and mandates the law's invalidation.

The Plaintiffs—an assortment of state and local political parties, political action committees (PACs), and individuals—contend that these campaign finance provisions are unconstitutional as applied to them. The challengers include both state and local party organizations: the Republican Party of New Mexico (NM-GOP), the Republican Party of Dona Ana County, and the Republican Party of Bernalillo County. The PACs include the New Mexicans for Economic Recovery Political Action Committee (NMER) and New Mexico Turn Around (NMTA), two entities organized to engage in express advocacy. NMER is registered as a political committee with the New Mexico Secretary of State. Its stated purpose is

---

[1](...continued)
N.M. Stat. § 1-19-34.7.

to make independent expenditures but not contributions to candidates' campaigns. NMTA has a broader purpose: to make both independent expenditures and contributions to candidates' campaigns.

Claiming an infringement on their First Amendment right to engage in protected political speech, the organizations sought in district court a preliminary injunction. The district court ultimately enjoined two provisions but only one is on appeal: a provision which prevents individuals from making contributions to political committees in excess of $5,000. N.M. Stat. § 1-19-34.7(A)(1). In enjoining the enforcement of this provision, the district court found that under *Citizens United*, the Supreme Court held there was no anti-corruption interest in limiting independent *expenditures*. Consequently, the court concluded, as has nearly every circuit court since *Citizens United*, there could be no anti-corruption interest in limiting *contributions* to be used for such expenditures. The district court also reasoned that even if NMER and NMTA had interests closely aligned with a political party, this alignment would not change the analysis because, under Supreme Court precedent, political parties could also make unlimited independent expenditures. And as long as funds contributed to NMTA for independent expenditures were kept segregated from funds that would be given to candidates, the statute could not restrict those contributions.

New Mexico timely appealed the district court's grant of the preliminary injunction, and we exercise jurisdiction under 28 U.S.C. § 1292(a)(1).

## II.  Analysis

To obtain a preliminary injunction the moving party must demonstrate:  (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest.  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).  We review the grant of a preliminary injunction for abuse of discretion.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).

This appeal centers on the first prong, the plaintiffs' likelihood of success on the merits.

### A.  *Legal Framework–Campaign Finance Regulation*

The First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office."  *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011) (internal quotation marks omitted).  A "major purpose of the First Amendment was to protect the free discussion of governmental affairs" especially of candidates and their beliefs and performance.  *Id.* at 2828.  And as the Supreme Court explained in its seminal campaign regulation decision, *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam), political speech is the lifeblood of democracy—it is the means by which citizens learn about candidates, hold their leaders accountable, and debate the issues of the day.

-7-

But speech comes in many forms, and the Supreme Court in *Buckley* recognized that the financing and spending necessary to enable political speech receives substantial constitutional protection. *See id.* at 19. In fact, the Court observed that restrictions on money spent on speech are the equivalent of restrictions on speech itself: "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* For these reasons, laws that burden political speech are subject to careful judicial review.

*Buckley* was careful to draw a distinction between limitations on *expenditures* for political speech and limitations on *contributions* to candidates. "[W]e have understood that limits on political expenditures deserve closer scrutiny than restrictions on political contributions." *FEC v. Colo. Republican Fed. Campaign Comm.* (*Colorado II*), 533 U.S. 431, 440 (2001). Expenditures are core political speech directly advancing public debate, subject to strict scrutiny. Expenditures cannot be restricted unless narrowly tailored to advance a compelling state interest. *See FEC v. Wis. Right to Life*, 551 U.S. 449, 464 (2007).

By contrast, contribution limitations that restrict "the amount that any one person or group may contribute to a candidate or political committee entail[] only

-8-

a marginal restriction upon the contributor's ability to engage in free communication." *Buckley*, 424 U.S. at 20–21. A contribution only "serves as a general expression of support for the candidate and his views," and the quantity of the contribution does not significantly affect this political communication. *Id.* But such limitations still implicate core First Amendment rights. *See Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 299 (1981) ("Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression."). Thus, while not subject to strict scrutiny, contribution limits still involve a "significant interference with associational rights" and "must be closely drawn to serve a sufficiently important interest." *Davis v. FEC*, 554 U.S. 724, 740 n.7 (2008); *Buckley*, 424 U.S. at 25.[2]

Contributions can come in several forms. In addition to direct contributions to candidates, for example, expenditures coordinated with a candidate are seen as indirect contributions, since they amount to nothing more than spending by the candidate himself. *Id.* at 46 n.53. The Court has also

---

[2] Some Justices have expressed disagreement with *Buckley*'s application of a lower level of scrutiny to contribution limits. *See, e.g.*, *Randall v. Sorrell*, 548 U.S. 230, 265–73 (2006) (Thomas, J., concurring). And Justice Stevens even rejected the notion of money as speech by proxy, *see Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 398–99 (2000) (Stevens, J., concurring), suggesting an even lower level of scrutiny for campaign regulations. We need not weigh in on the proper level of scrutiny for contribution limits, because in the wake of *Citizens United*, limits on contributions to PACs for the purpose of making independent expenditures are unconstitutional even under a lower level of scrutiny.

upheld limits on contributions to political committees that make multiple contributions to candidates, limits on contributions to political parties, and restrictions on political parties' coordinated expenditures with their candidates. *See Cal. Med. Ass'n v. FEC*, 453 U.S. 182 (1981) (*Cal-Med*) (multi-candidate political committees); *McConnell v. FEC*, 540 U.S. 93 (2003) (contributions to political parties), *overruled in part by Citizens United*, 558 U.S. at 365–66; *Colorado II*, 533 U.S. at 465 (coordinated expenditures by political parties).

But ever since *Buckley*, the Court has struck down limits on independent expenditures, *i.e.*, those that are not coordinated with candidates. The Court's rationale has been that independent expenditures by individuals do not pose the same risks as direct contributions. 424 U.S. at 47–48. And in a series of cases since *Buckley* the Court has repeatedly struck down limits on the independent expenditures by political parties, political action committees, unions, and corporations. *See Colo. Republican Fed. Campaign Comm. v. FEC* (*Colorado I*), 518 U.S. 604, 618 (1996) (political parties); *FEC v. Nat'l Conservative PAC* (*NCPAC*), 470 U.S. 480 (1985) (political action committees); *Citizens United*, 558 U.S. at 365 (unions and corporations); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 795 (1978) (corporations).

The *Buckley* framework, importantly, recognizes only a narrow governmental interest in regulating political speech—preventing corruption or the appearance of corruption. When *Buckley* "identified a sufficiently important

governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption." *Citizens United*, 558 U.S. at 359. "The hallmark of corruption is the financial *quid pro quo*: dollars for political favors." *NCPAC*, 470 U.S. at 497.

*Citizens United* stepped into a long-running debate over what other governmental interests might satisfy the government's regulatory interest in political speech. In that case, Citizens United, a non-profit corporation, produced a documentary highly critical of Hillary Clinton, then a presidential candidate in the 2008 Democratic primaries. 558 U.S. at 319–20. Because of the movie's strong criticism of Clinton's candidacy, Citizens United worried the FEC might deem the movie an "electioneering communication," which, under 2 U.S.C. § 441b, corporations and unions were prohibited from making. An electioneering communication was defined by federal law as "any broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal office" and was made within sixty days of a general election or thirty days of a primary election. 2 U.S.C. § 434(f)(3)(A). The FEC regulation further defined an "electioneering communication" as one that was "publicly distributed." 11 C.F.R. § 100.29. Citizens United sought declaratory and injunctive relief against the FEC, arguing that § 441b was unconstitutional as applied to its movie.

The Supreme Court struck down § 441b. The Court held that independent expenditures could not be restricted merely because of the corporate identity of

the speaker.  In doing so, the Court overruled *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), a plurality opinion which had held that restrictions on political speech by corporations furthered a permissible governmental interest in reducing the distorting financial influence of business corporations on the political process.  The Court rejected *Austin*'s application of a broad anti-distortion rationale to support campaign finance restrictions and held that the only valid interest for restricting political speech was preventing *quid pro quo* corruption.  *Citizens United*, 558 U.S. at 359.  "The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate."  *Id.* at 357 (quoting *Buckley*, 424 U.S. at 47).

*Citizens United* thus resolved a longstanding debate over whether other governmental interests could support restrictions on campaign financing.[3]  "Over time, various other justifications for restricting political speech have been

---

[3] Disclosure and disclaimer requirements, on the other hand, are subject to "exacting scrutiny" and may be upheld if there is "a 'substantial relation' between the disclosure requirement and a 'sufficiently important governmental interest'"—namely, opening up information to the public.  *Citizens United*, 558 U.S. at 366–67 (quoting *Buckley*, 424 U.S. at 64, 66).  The Court upheld disclosure requirements at issue in *Citizens United* because they provided the electorate with information about the identity of the speaker and did not impose a chill on political speech, even for independent expenditures.

offered—equalization of viewpoints, combating distortion, leveling electoral opportunity, encouraging the use of public financing, and reducing the appearance of favoritism and undue political access or influence—but the Court has repudiated them all.  As such, after *Citizens United* there is no valid governmental interest sufficient to justify imposing limits on fundraising by independent-expenditure organizations."  *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 153–54 (7th Cir. 2011) (citations omitted).

*Citizens United* also opened the playing field for independent expenditures by non-profit corporations.  After *Citizens United*, the Court no longer perceives a "threat of *quid pro quo* corruption"

> when independent groups spend money on political speech. By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate. The separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in the sort of *quid pro quo* corruption with which [the Court's] case law is concerned. In short, the candidate-funding circuit is broken. *Citizens United* thus held as a categorical matter that independent expenditures do not lead to, or create the appearance of, *quid pro quo* corruption.

*Id.* at 153 (internal quotation marks omitted).

It is worth repeating:  the Court firmly rejected the contention that independent expenditures give rise to corruption or the appearance of corruption. "The appearance of influence or access . . . will not cause the electorate to lose

-13-

faith in our democracy.  By definition, an independent expenditure is political speech . . . not coordinated with a candidate." *Citizens United*, 558 U.S. at 360. And, in any event, as the Court saw it, "[i]ngratiation and access . . . are not corruption," *id.*, since "[f]avoritism and influence are not . . . avoidable in representative politics.  It is in the nature of an elected representative to favor certain policies, and, by necessary corollary, to favor the voters and contributors who support those policies." *Id.* at 359 (quoting *McConnell*, 540 U.S. at 297 (Kennedy, J., concurring in part and dissenting in part)).

In sum, *Citizens United* resolved the right of a non-profit corporation to make independent expenditures without limits as to their source and amount.  In its wake, the circuit courts have also uniformly struck down limitations on *contributions* to entities engaged in independent expenditures.  Those cases are relevant to our conclusion here.

In the first decision analyzing contribution limitations following *Citizens United*, the D.C. Circuit found unconstitutional the Bipartisan Campaign Reform Act's contribution limits as applied to an independent expenditure-only group. *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010).  Recognizing the government's anti-corruption interest as the only legitimate basis for limiting contributions, the D.C. Circuit reasoned that "because *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in

limiting contributions to independent expenditure-only organizations." *Id.* at 696.

The court rejected the argument that independent expenditures "lead to

preferential access for donors and undue influence over officeholders," because,

following *Citizens United*, "ingratiation and access . . . are not corruption." *Id.* at

694 (alteration omitted). In response, the FEC argued that *Citizens United* did

not unsettle *Buckley*'s decision upholding contribution limits. *Buckley*, however,

concerned only direct contributions to candidates. The court reasoned that

although limits on direct contributions to candidates may prevent *quid pro quo*

corruption, limits on contributions for the purpose of making independent

expenditures promote no anti-corruption interest. *Id.*

Five other circuits have also struck down contribution limits to independent

expenditure groups. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 487

(2d Cir. 2013) (holding that an aggregate limit on an individual's contributions is

unconstitutional as applied to contributions to groups for independent

expenditures); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 538

(5th Cir. 2013) (holding that a state law ban on corporate contributions cannot be

applied to independent expenditure committees); *Farris v. Seabrook*, 677 F.3d

858, 867 (9th Cir. 2012) (concluding there was no state interest limiting

contributions to independent recall committees at $800); *Thalheimer v. City of*

*San Diego*, 645 F.3d 1109, 1121 (9th Cir. 2011) (concluding, in affirming grant of

preliminary injunction, that local ordinance capping contributions to independent

-15-

expenditure committees at $500 violated First Amendment); *Long Beach Area*

*Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 698–99 (9th Cir.

2010) (holding that local ordinance restricting contributions cannot be applied to

political action committee seeking to use funds for independent expenditures);

*Barland*, 664 F.3d at 155 (holding that state law restricting contributions at

$10,000 cannot be applied to independent expenditure committees); *N.C. Right to*

*Life, Inc. v. Leake*, 525 F.3d 274, 293 (4th Cir. 2008) (holding unconstitutional a

state law limiting contributions to $4,000 as applied to independent expenditure

committees).[4]

With this framework, we turn to New Mexico's regulations.

### B. Application

---

[4]  The Eleventh Circuit in an unpublished opinion declined to hold unconstitutional limits on PAC-to-PAC contributions for the purpose of independent expenditures. *See Alabama Democratic Conference v. Broussard*, __ F. App'x __, 2013 WL 5273304 (11th Cir. Sept. 19, 2013).  The panel cited evidence of coordination between the Alabama Democratic Party and the Alabama Democratic Conference PAC in holding that the state may be able to justify the application of a contribution limitation.  But even so, the logic of *Citizens United* would insist on the enforcement of bans on coordination, rather than targeting an entire class of contributions to independent groups.  *Citizens United* did not treat corruption as a fact question to be resolved on a case-by-case basis.  Instead, the Court considered whether *independent speech* is the type that poses a risk of *quid pro quo* corruption or the appearance thereof.  *See Citizens United*, 558 U.S. at 360.  The Court determined that speech through independent expenditures does not pose such a risk.  But it did not question the government's authority to enforce restrictions against coordination between candidates and independent expenditure PACs—coordination breaks the essential independence of the expenditure and has always been deemed the functional equivalent of a candidate contribution.  *Id.*

*Citizens United* governs the outcome in this case. Because there is no corruption interest in limiting independent expenditures, there can also be no interest in limiting contributions to non-party entities that make independent expenditures. If an entity can fund unlimited political speech on its own without raising the threat of corruption, no threat arises from contributions that create the fund. As every other circuit to consider the issue has recognized, *quid pro quo* corruption no longer justifies restrictions on uncoordinated spending for independent expenditure-only entities, and the absence of a corruption interest breaks any justification for restrictions on contributions for that purpose. Consequently, as the district court found, NMER is likely to succeed on the merits of its First Amendment challenges to New Mexico's law.

The district court also found in favor of NMTA, which would like to make both candidate contributions *and* independent expenditures. New Mexico's arguments require more consideration. But in the end, as we explain, the difference does not materially change our conclusions in light of *Citizens United*. Any anti-corruption interest posed by candidate contributions are resolved by the limitation on those contributions—NMTA's direct contributions to candidates are limited to $10,000 per election cycle. No such interest is met by limitations on its independent expenditures as long as there is no coordination with candidates. In short, New Mexico should be satisfied that its $10,000 per election cycle

-17-

limitation averts corruption or its appearance, and thus has no further interest in limiting contributions intended for independent expenditures.

In an instructive case, the D.C. Circuit addressed the situation where a PAC made independent expenditures and contributed to individual candidates. *Emily's List v. FEC*, 581 F.3d 1 (D.C. Cir. 2009). The court explained that a PAC that makes independent expenditures "does not suddenly forfeit its First Amendment rights when it decides also to make direct contributions to parties or candidates." *Id.* at 12. The court noted the PAC merely needs to ensure that its contributions to parties or candidates come from an account set up for that purpose, not one used for independent expenditures. *Id.* Applying these principles, the court found unconstitutional regulations requiring Emily's List to use a portion of its limited "hard-money" funds (those given directly to candidates) for advertisements, get-out-the-vote efforts, and voter registration drives. *Id.* at 16. In other words, the PAC had the right to raise unlimited funds for independent spending and could not be forced to fund portions of their independent activities from their hard-money accounts (for which contributions were limited to $5,000). *Id.* The FEC did not petition the Supreme Court for certiorari and ultimately withdrew the challenged regulations. *See* 11 C.F.R. § 106.6(c), (f), *reversed by* 75 Fed. Reg. 13223 (Mar. 19, 2010).

In this case, NMTA is similarly situated. It makes both independent expenditures and candidate contributions. It maintains separate accounts for these

purposes and, under the record we have, adheres to contribution limits for donations to its candidate account. In these circumstances, under the logic of *Citizens United*, no anti-corruption interest is furthered as long as the NMTA maintains an account segregated from its candidate contributions. *See Carey v. FEC*, 791 F. Supp. 2d 121, 131–32 (D.D.C. 2011) (concluding that maintaining separate accounts for direct contributions and for independent expenditures satisfies federal law). Because NMTA maintains such a segregated account, it does not run afoul of candidate contribution restrictions.

New Mexico puts forward two main counter-arguments: (1) it points to Supreme Court precedent prior to *Citizens United* that, it contends, supports limits on contributions for independent expenditures; and (2) the state's interest in preventing circumvention of valid contribution limits is a compelling interest even after *Citizens United*.

In support of its first argument, New Mexico points to *Buckley*, *Cal-Med*, *Colorado I*, and *McConnell*. Yet every one of those cases concerns contributions to entities different than those at issue here, and none supports its argument.

In *Buckley*, the Court upheld contribution limits to candidates but struck down limits on expenditures. One of the contribution limits the Court upheld was the $25,000 aggregate limit on contributions to candidates and political committees. 424 U.S. at 38. But the Court was not addressing contributions to political committees for independent expenditures, only contributions to "political

committees likely to contribute to [a particular] candidate." *Id.* The concern was that the absence of an aggregate cap would facilitate "evasion of the $1,000 contribution limitation." *Id.* In other words, a donor could make numerous contributions to different PACs likely to make contributions to the favored candidate and thereby evade the individual limits on contributions to candidates. The aggregate limitation served a justifiable limit on a donor's ability to contribute dollars directly to a candidate, either personally or through a PAC.[5]

Similarly, in *Cal-Med*, the Supreme Court reaffirmed contribution limits to multi-candidate political committees, *i.e.*, PACs that made campaign contributions to multiple candidates. The Court reasoned, as in *Buckley*, Congress could restrict contributions to such committees or else individuals could circumvent the $1,000 limit on individual contributions and the $25,000 aggregate limit. 453 U.S. at 197–99. In the opinion, however, there was no discussion, let alone approval, of contribution restrictions for independent expenditures. In fact, Justice Blackmun, in his concurring (and controlling) opinion, underscored that "a different result would follow if [the restrictions] were applied to contributions to a political committee established for the purpose of making *independent*

---

[5] The federal aggregate limitations are currently subject to a challenge in the Supreme Court in *McCutcheon v. FEC*, No. 12-536 (U.S. argued Oct. 8, 2013).

*expenditures*, rather than contributions to candidates." *Id.* at 203 (Blackmun, J., concurring) (emphasis added).

In the next case New Mexico identifies, *Colorado I*, the Supreme Court addressed independent expenditure limits on political parties. The Court held that Congress could not limit the uncoordinated expenditures of political parties, but the principal opinion noted that contributions to parties may pose a threat of corruption because they enable independent party expenditures to benefit a particular candidate. *Colorado I*, 518 U.S. at 617.

The Court made clear in *McConnell*, however, that the government could limit contributions to parties because of their inherent connection to and close affiliation with their candidate standard-bearers. In *McConnell*, the Court upheld limits on soft-money contributions to political parties—funds used for issue advocacy and get-out-the-vote efforts. The Court held that "contributions to a federal candidate's party in aid of that candidate's campaign threaten to create—no less than would a direct contribution to the candidate—a sense of obligation." *McConnell*, 540 U.S. at 144. "This is particularly true of contributions to national parties, with which federal candidates and officeholders enjoy a special relationship and unity of interest." *Id.* at 145.

*McConnell* demonstrates the Court's belief that political parties are so inherently affiliated with candidates to justify a presumption that money a contributor might give to a party will be spent on that candidate, thereby evading

-21-

the candidate contribution limits.  But neither *Colorado I* nor *McConnell* has anything to say about contributions to political entities unaffiliated with candidates or parties.  And given *Citizens United*, there can be no similar concern with contributions for independent expenditures by an entity unaffiliated with a candidate.

Drilling deeply into *McConnell*, New Mexico further argues that one footnote—footnote 48—should be read as justifying restrictions on contributions to non-party political committees.  The footnote discusses the Court's holding in *Cal-Med*, which as we have explained, upheld contributions limitations to multi-candidate PACs to implement the $1,000 cap on contributions to particular candidates and the $25,000 combined cap on contributions to all candidates.[6]

---

[6]  In responding to Justice Kennedy's dissent arguing a narrow view of corruption, the *McConnell* majority upheld BCRA's restriction on soft money contributions to political parties, stating,

> [I]n [*Cal-Med*], we upheld FECA's $5,000 limit on contributions to multicandidate political committees. It is no answer to say that such limits were justified as a means of preventing individuals from using parties and political committees as pass-throughs to circumvent FECA's $1,000 limit on individual contributions to candidates. Given FECA's definition of 'contribution,' the $5,000 and $25,000 limits restricted not only the source and amount of funds available to parties and political committees to make candidate contributions, but also the source and amount of funds available to engage in express advocacy and numerous other noncoordinated expenditures. If indeed the First

(continued...)

-22-

New Mexico claims the footnote expands *Cal-Med* not just to prevent the circumvention of aggregate contribution limits to candidates but also to limit independent expenditures.

Yet there is good reason this interpretation is misplaced. As noted above, Justice Blackmun in his concurring opinion in *Cal-Med* stated that his decision to uphold the limit on contributions would be different if the restrictions "were applied to contributions to a political committee established for the purpose of making independent expenditures, rather than contributions to candidates." *Cal-Med*, 453 U.S. at 203 (Blackmun, J., concurring). In other words, Justice Blackmun concluded "that contributions to political committees can be limited *only if* those contributions implicate the governmental interest in preventing actual or potential corruption." *Id.* (emphasis added). And Justice Blackmun was the fifth vote upholding the statute, and thus his more narrow view of the Court's holding is controlling. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("[T]he holding of the Court may be viewed as that position taken by those

---

[6](...continued)
        Amendment prohibited Congress from regulating contributions to fund the latter, the otherwise-easy-to-remedy exploitation of parties as pass-throughs (e.g., a strict limit on donations that could be used to fund candidate contributions) would have provided insufficient justification for such overbroad legislation.

540 U.S. at 152 n.48.

Members who concurred in the judgments on the narrowest grounds."). Absent strong evidence to the contrary, it is unlikely that the *McConnell* Court meant to expand the narrow holding of *Cal-Med*.

The *McConnell* Court's analysis, moreover, was primarily aimed at the soft-money activities of *parties*, namely, Congress's concern that parties acted as "pass-throughs" because of their natural affiliation with the party's candidates. *McConnell*, 540 U.S. at 152 n.48. But groups that do not share a party relationship are treated differently. The Court noted that "[i]nterest groups . . . remain free to raise soft money" and affirmed Congress's recognition of the "real-world differences between political parties and interest groups when creating a system of campaign finance." *Id.* at 188. These comments reflect the Court's acceptance of the analytical differences between parties and independent expenditure groups for purposes of First Amendment protection: more onerous contribution restrictions may be placed on political parties than on independent groups. At most, what *McConnell*'s reliance on *Cal-Med* stands for is that political parties have a close enough relationship with candidates such that Congress can justifiably restrict contributions to parties—in ways that go beyond merely preventing the circumvention of contribution limits to candidates. In that case, it meant soft-money to parties was an appropriate target. But there is no analog here for independent political committees. As one court explained, it is "not an exaggeration to say that *McConnell* views political parties as different in

kind than independent expenditure committees." *N.C. Right to Life*, 525 F.3d at 293.

New Mexico's reading of footnote 48 is also inconsistent with the holding of *Citizens United*. The holding in *McConnell* suggested that it is proper to evaluate a donation or expenditure's "potential impact on a candidate's election" or "value to the candidate" when assessing the potential for actual or apparent corruption. 540 U.S. at 152. This discussion and footnote 48 were responses to Justice Kennedy's narrower and "crabbed view of corruption," *id.*—a view that the Supreme Court (per Justice Kennedy now in the majority) expressly adopted in *Citizens United* as the only justification for campaign finance restrictions. *Citizens United* affirmed that government can restrict campaign financing only to prevent actual or apparent *quid pro quo* corruption. To the extent that footnote 48 rests on the assumption that the government may restrict speech for any reason besides the prevention of actual or apparent *quid pro quo* corruption, New Mexico's reading is foreclosed by *Citizens United*.[7]

---

[7] New Mexico's interpretation of footnote 48 also threatens to upend the longstanding *Buckley* framework. If a contribution to outside groups for the purpose of making independent expenditures implicates the government's anti-corruption interest, then the same interest is implicated by the independent expenditures themselves. This would mean that "the entire *Buckley* edifice, built on a foundation of a contribution-expenditure dichotomy, falls." Richard L. Hasen, Buckley *Is Dead, Long Live* Buckley*: The New Campaign Finance Incoherence of* McConnell v. Federal Election Commission, 153 U. Pa. L. Rev. 31, 70 (2004). "Is that what the Court really intended buried in a few sentences

(continued...)

One district court suggested that even if limits on contributions to independent expenditure-only PACs are unconstitutional, hybrid PACs that make both independent expenditures and contributions to candidates may implicate the government's anti-corruption interest. In *Stop This Insanity, Inc. Employee Leadership Fund v. FEC*, 902 F. Supp. 2d 23 (D.D.C. 2012), the court held that a hybrid PAC's use of separate bank accounts for campaign contributions and independent expenditures was insufficient to overcome the appearance of corruption that exists when a single entity conducts both activities. In so holding, the court disagreed with another judge in the district, *see Carey*, 791 F. Supp. 2d at 131–32, and more directly with the D.C. Circuit's holding in *Emily's List*, 581 F.3d at 12.

*Stop This Insanity* does not offer a compelling rationale why combining two activities, neither of which by itself is corrupting, into a single entity suddenly increases the risk of real or apparent *quid pro quo* corruption. The court asserted that a PAC's direct contribution compromises, or at least appears to compromise, the independence of its express advocacy. *See id.* But a direct contribution is not an example of the type of coordination that implicates a PAC's independent advocacy. In *Citizens United*, the Court held that independent expenditures are

---

⁷(...continued)
of a footnote in one of the longest cases in Supreme Court history?" *Id.*; *see also Emily's List*, 581 F.3d at 14 n.13 (declining to adopt expansive reading of footnote 48).

by definition uncoordinated with candidates and cannot lead to the appearance of

*quid pro quo* corruption. 558 U.S. at 360.[8] A hybrid PAC's direct contribution

does not alter the uncoordinated nature of its *independent expenditures*; there still

must be some attendant coordination with the candidate or political party to make

corruption real or apparent.[9] In any event, a hybrid PAC must respect both direct

---

[8] We recognize, of course, that candidates are no doubt grateful for the support of independent groups, but as we point out above, *Citizens United* held that "ingratiation and access . . . are not corruption." 558 U.S. at 310. For an interpretation of independent expenditures supported by the Press Clause of the First Amendment that avoids this difficulty, *see* Michael W. McConnell*, Reconsidering* Citizens United *as a Press Clause Case*, 123 Yale L.J. 412 (2013) (concluding *Citizens United*'s non-corruption explanation is overall unconvincing and made the decision appear "naïve or obtuse").

[9] The FEC distinguishes independent expenditures from coordinated contributions under the following regulation:

> (a) The term independent expenditure means an expenditure by a person for a communication expressly advocating the election or defeat of a clearly identified candidate that is not made in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents.
>  . . . .
> (c) No expenditure shall be considered independent if the person making the expenditure allows a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents to become materially involved in decisions regarding the communication . . . .

11 C.F.R. § 100.16 (2013).

-27-

contribution limits and anti-coordination laws. These measures satisfy the

government's anti-corruption interest with respect to hybrid PACs.[10]

Finally, New Mexico contends that its anti-circumvention rationale justifies

the contribution limits. *See Colorado II*, 533 U.S. at 456 ("[A]ll members of the

Court agree that circumvention is a valid theory of corruption."). New Mexico

argues the threat of circumvention gives the state the authority to restrict

contributions and expenditures that are not directly corrupting but may facilitate

---

[10] *Stop This Insanity* conflicts with *Carey*, another case from the same district court. *Carey* endorses the concept a single entity may make both candidate contributions and independent expenditures from segregated accounts. *See* 791 F. Supp. 2d at 130–32. The FEC, for now, also endorses that approach:

> The Commission will no longer enforce 2 U.S.C. §§441a(a)(1)(C) and 441a(a)(3), as well as any implementing regulations, against any nonconnected political committee with regard to contributions from individuals, political committees, corporations, and labor organizations, as long as (1) the committee deposits the contributions into a separate bank account for the purpose of financing independent expenditures, other advertisements that refer to a Federal candidate, and generic voter drives (the "Non-Contribution Account"), (2) the Non-Contribution Account remains segregated from any accounts that receive source-restricted and amount-limited contributions for the purpose of making contributions to candidates, and (3) each account pays a percentage of administrative expenses that closely corresponds to the percentage of activity for that account.

*FEC Statement on* Carey v. FEC*, Reporting Guidance for Political Committees that Maintain a Non-Contribution Account* (Oct. 5, 2011), http://www.fec.gov/press/Press2011/20111006postcarey.shtml.

the evasion of other valid limits. Yet there can be no freestanding anti-circumvention interest. As *Cal-Med* and *Colorado II* indicate, there must be an underlying risk of corruption that justifies a contribution limit, and there must be a real possibility of evading those valid limits through unlimited contributions. Here, there is no underlying risk of corruption since NMTA's contributions to candidates are controlled and any independent expenditures are not corrupting. *Citizens United*, 558 U.S. at 360. As long as the PAC does not pass along the donors' funds to candidates or coordinate with candidates in making expenditures, there is no possibility that unlimited contributions for independent expenditures will enable donors to skirt otherwise valid contribution limits.[11]

As a fallback argument, New Mexico has suggested both here and below that NMER and NMTA are not really independent of the Republican Party of New Mexico, due to overlapping membership between the leadership of the PACs and that of the state and local branches of the Republican Party. *See* Aplt. Br. at 9;

---

[11] In *Alabama Democratic Conference*, an Eleventh Circuit panel suggested that hybrid PACs could pose a unique risk of circumvention of individual contribution limits. A supporter of a particular candidate may donate to a hybrid PAC's independent expenditure account while extracting a promise from the PAC to donate to a particular candidate from its hard-money account. 2013 WL 5273304 at *2. The potential that a large donor may extract a promise that the PAC will contribute to a particular candidate, however, concerns only the control over the PAC's agenda. It does not affect the funds available in the PAC's hard-money account, which is subject to strict restrictions on the amount it may raise from a single donor and contribute to single candidate. This scenario would not result in circumvention of individual contribution limits.

Aplt. App. 129–30.  The district court rejected these concerns:  "Since political parties legally can make independent expenditures, the mere fact that NMER and NMTA are closely related to political parties does not affect the analysis regarding their ability to make independent expenditures."  Aplt. App. 299.

We agree, but with this caveat.  While it is true that political parties can make unlimited independent expenditures, *see Colorado I*, 518 U.S. at 618, the Supreme Court in *McConnell* upheld restrictions on soft-money contributions to political parties—funds not passed along to candidates' campaigns but used for a party's general operating costs, get-out-the-vote drives, and issue advocacy.  And *McConnell* supports limits like those in BCRA that restrict soft-money contributions to political parties.  *See McConnell*, 540 U.S. at 145 (noting that an "ample record in these cases" supported the congressional finding that soft-money contributions to national party committees have "a corrupting influence").

The difference between this case and *McConnell*, however, is that New Mexico's definition of a "political committee" includes both political parties and nonparty political committees.  N.M. Stat. § 1-19-26(L).  A state political party, due to *McConnell*, is much less likely to bring a successful as-applied challenge to a limitation on the contributions it may receive, particularly if there was record evidence of state or local "parties hav[ing] *sold* access" to candidates.  540 U.S. at 153 (emphasis in original); *see also Republican Nat'l Comm. v. FEC*, 698 F. Supp. 2d 150 (D.D.C. 2010) (three-judge panel) (applying *McConnell*, post-

-30-

*Citizens United*, to uphold federal ban on unlimited soft-money to state and local parties).

While the record suggests that there is some overlapping leadership,[12] the question before us is whether political committees that are not formally affiliated with a political party or candidate may receive unlimited contributions for independent expenditures. On this question the answer is yes.

If the political committees are indirectly controlled by political parties, that would raise a separate issue—coordination. Though this question is not before us, we note that the Supreme Court has long upheld provisions which designate coordinated expenditures as indirect contributions. *See Colorado II*, 533 U.S. at 464–65; *Buckley*, 424 U.S. at 46 & n.53. If a PAC were making expenditures that were coordinated with a political party, then such expenditures could be deemed contributions to a political party. And those contributions would be subject to whatever limitations that are still valid under *McConnell*. If New Mexico believes that there is improper coordination between a PAC and a state or local

_____

[12] For example, Chris Collins is listed as the treasurer of NMER on its registration form with the New Mexico Secretary of State, Aplt. App. 60, and he attests to this fact in the Plaintiffs' verified pleadings, *id.* at 39–40. In a separate part of the same verified pleadings, Collins also declares that he is the chairman of the Republican Party of Bernalillo County. *Id.* at 35–36. In their complaint, Plaintiffs admit that NMER was "organized by" NM-GOP but insist that it "operates completely independently of the NM-GOP, candidates, officeholders, NM-GOP officers and staff, NM-GOP's Executive Committee, and the NM-GOP chairman." *Id.* at 22.

political party, then it could bring an enforcement action. But the record at the preliminary injunction stage does not disclose any unlawful coordination, nor did the parties adequately brief the issue on appeal or below.

In sum, contribution limits must be "closely drawn" to serve "a sufficiently important interest," namely, the prevention of corruption or the appearance of corruption. The Supreme Court has held that independent expenditures do not invoke the anti-corruption rationale, and New Mexico does not differentiate between contributions for independent expenditures and contributions for candidate contributions. We therefore conclude that NMER and NMTA have satisfied their showing of likelihood of success that N.M. Stat. § 1-19-34.7(A)(1) is unconstitutional as applied to contributions to those organizations to be used solely for independent expenditures.

## III. Conclusion

Because NMER and NMTA are likely to prevail on the merits in their challenge against New Mexico's law, we AFFIRM the district court's grant of a preliminary injunction enjoining the law's enforcement.