*State of Vermont v. Republican Governors Ass'n*, No. 759-10-10 Wncv (Toor, J., Oct. 20, 2014).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
WASHINGTON UNIT
CIVIL DIVISION

| | |
|---|---|
| STATE OF VERMONT,<br> Plaintiff<br><br> v.<br><br> REPUBLICAN GOVERNORS<br> ASSOCIATION,<br> Defendant | Docket No. 759-10-10 Wncv |

RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

The State of Vermont brought this action in 2010 against the Republican Governors Association (RGA) to enforce registration, disclosure, and contribution limit requirements of its election laws.[1] The State alleged that RGA was active in Vermont during the 2010 Dubie–Shumlin race, but refused to register and file reports as a political committee, and accepted contributions in excess of the $2,000 limit.

Procedural History

In 2011, Judge Crawford granted summary judgment for the State, ruling that Vermont's "disclosure and disclaimer requirements" were legally enforceable, and that the $2,000 contribution limit was constitutional. Decision on Cross-Motions for Summary Judgment at 11 (Oct. 4, 2011).[2] However, in August of 2012, in the process of ruling on a discovery issue related to the RGA's affirmative defenses, Judge Crawford *sua sponte* reopened the issue of the $2,000

---

[1] The State brought a similar case, absent the contribution limit claim, against Green Mountain Future (GMF), a Vermont political committee organized by the Democratic Governors Association. The trial court found GMF in violation and the Vermont Supreme Court affirmed. *See* State v. Green Mountain Future, No. 758-10-10 Wncv, 2011 WL 8472923 (Vt. Super. Ct. June 2011) (Crawford, J.), *aff'd*, 2013 VT 87, 194 Vt. 625.

[2] RGA'a affirmative defenses were not addressed in that ruling. The parties appear to agree they have since been resolved in the State's favor, although the court cannot find any written decision to that effect.

contribution limit. He noted that "things have changed with the announcement that [the State] will not enforce the $2,000 limit" due to recent case law. Decision on Motion to Quash Subpoenas at 2 (Aug. 31, 2012). Thus, he stated his intention not to enforce that part of his earlier decision and invited briefing. The State then argued that the announcement about not enforcing the $2,000 limit, and the cases that led to it, related only to "independent-expenditure only" groups. *See* State of Vermont's Memorandum on Enforcement of $2,000 Contribution Limit (Sept. 24, 2012). RGA responded that it makes only "independent expenditures." *See* Defendant's Response to Plaintiff's Memorandum on Enforcement of $2,000 Contribution Limit (Oct. 10, 2012).

Judge Crawford had a hearing on the issue—apparently oral argument only, not an evidentiary hearing—and subsequently ruled that he did not have sufficient evidence on which to decide the question. Order re: Enforcement of $2,000 Contribution Limit at 4 (Oct. 31, 2012). Discovery was then allowed on the issue, and the case was then stayed for a period of time for other reasons. Finally, the State filed a motion for summary judgment on the remaining issue and RGA responded with a cross-motion. Those motions are what is currently before the court.[3]

### The Constitutional Issue

Federal First Amendment jurisprudence leading up to Citizens United v. Federal Election Commission, 558 U.S. 310 (2010), was approaching the conclusion that limitations on contributions to political committees making "independent expenditures" on candidate-specific political speech are unconstitutional. *See, e.g.*, North Carolina Right to Life, Inc. v. Leake, 525

---

[3] As noted above, in granting summary judgment for the State initially, Judge Crawford deferred ruling on the RGA's affirmative defenses of laches and selective prosecution. He later issued a discovery ruling that seemed to entirely reject those defenses, although he permitted additional third-party discovery on those issues. The parties appear to agree they have since been resolved in the State's favor, although the court cannot find any express written decision to that effect.

2

F.3d 274, 293–95 (4th Cir. 2008). The cases generally do not define "independent expenditure," but there is a federal election statute that provides a definition. Although it is not entirely clear that the cases rely upon this definition, the statute defines an independent expenditure as one:

> (A) expressly advocating the election or defeat of a clearly identified candidate; and

> (B) that is not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents.

52 U.S.C. § 30101(17), formerly 2 U.S.C. § 431(17).[4]

In Citizens United, the Supreme Court ruled that the only legitimate interest in limiting campaign expenditures is the reality or appearance of quid pro quo corruption. Independent expenditures, precisely because they are independent, as a matter of law present no such risk. Citizens United, 558 U.S. at 356–61. Thus, there is no constitutional basis for limiting corporate independent expenditures.

Although Citizens United addressed only expenditures by corporations, courts then began applying the same rationale to contributions to political committees making only independent expenditures. *See, e.g*., Catholic Leadership Coalition of Texas v. Reisman, 764 F.3d 409, 442 (5th Cir. 2014) (noting "a growing judicial consensus among the circuit courts that limits on corporate contributions to independent-expenditure-only committees are likewise unconstitutional"); SpeechNow.org v. Federal Election Comm'n, 599 F.3d 686, 694 (D.C. Cir. 2010) ("In light of the Court's holding as a matter of law that independent expenditures do not corrupt or create the appearance of quid pro quo corruption, contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption."). Under that analysis, if a group expends funds on behalf of a candidate without coordinating with

---

[4] The Vermont statute at the time relevant to this case had no definition of the term.

3

the campaign or a party committee, contributions to that group may not be limited.

Subsequent to Judge Crawford's initial ruling finding RGA in violation of Vermont's contribution limit, Judge Sessions issued a decision in <u>Vermont Right to Life Committee, Inc. v. Sorrell</u>, 875 F.Supp.2d 376 (D.Vt. 2012), *aff'd*, 758 F.3d 118 (2014). The plaintiffs in that case sought, among other things, to bar the State from enforcing the same contribution limit that is at issue in this case. Vermont Right to Life Committee (VRLC) had created two additional committees: Vermont Right to Life Political Committee (VRLC-PC), which would coordinate with or contribute directly to candidates, and Vermont Right to Life Committee–Fund for Independent Political Expenditures (VRLC-FIPE), which would make independent expenditures only. The plaintiffs argued that because VRLC-FIPE was organized as a separate entity and made independent expenditures only, under <u>Citizens United</u> there could be no constitutional basis for limiting contributions to it.

Judge Sessions rejected the argument that VRLC-FIPE's status as a separate entity alone was determinative. He observed:

> The issue of independence from candidates is the touchstone of the contribution limit's constitutionality. A number of the courts that have struck down limits on contributions applied to independent-expenditure-only PACs have made clear their reasoning would not hold to the extent the assumption of independence were undermined.

<u>Vermont Right to Life Committee</u>, 875 F.Supp.2d at 405. The court examined the evidence. It found the entities highly integrated and without any "significant functional divide between them for the purposes of campaign finance law." <u>Id</u>. at 408. Funds moved between them as needed without regard for source or purpose of the expenditure. Even if the constitution permitted one entity to carry on both independent expenditures and coordination and contributions, the court reasoned, there was no way to ensure that unlimited contributions to VRLC-FIPE were not used

4

for VRLC-PC's ends. On that basis, the court concluded that Vermont's contribution limit was enforceable against VRLC-FIPE. Id. at 410.

It was that decision that spurred the Attorney General to announce that he would no longer "enforce the $2,000 contribution limit for those PACs that demonstrate they make only independent expenditures." Attorney General's Guidance Regarding Independent Expenditure Committees (July 25, 2012). The parties agree that, as the law now stands, a state may not limit contributions to a political committee that makes independent expenditures only. They disagree sharply on what that means and what effect it has in this case. [5]

## Discussion

There is no dispute that RGA accepted contributions well in excess of the $2,000 limit. It argues, however, that it made independent expenditures only, and that any candidate contributions or coordination in Vermont were done through Green Mountain Prosperity (GMP), a Vermont-focused political committee that RGA set up and registered in Vermont. The State argues that there is no functional distinction between RGA and GMP, and thus RGA did not make only independent expenditures.

### A. Preliminary Issues

As a preliminary matter, the State argues that RGA missed its opportunity to raise this contribution-limit issue and the court should not address it now. For its part, RGA argues that Judge Crawford's prior orders discussing his view of the law control.

---

[5] On January 23, 2014, Governor Shumlin signed into law Act 90. 2013, No. 90 (Adj. Sess.), available at http://www.leg.state.vt.us/DOCS/2014/ACTS/ACT090.PDF. Act 90 repealed Vermont's then-existing campaign finance statute, 17 V.S.A. §§ 2801–2893, including the contribution limit at issue in this case, and replaced it with a new one, 17 V.S.A. §§ 2901–2986. The new law defines "independent expenditure-only political committee" as "a political committee that conducts its activities entirely independent of candidates; does not give contributions to candidates, political committees, or political parties; does not make related expenditures; and is not closely related to a political party or to a political committee that makes contributions to candidates or makes related expenditures." Id. § 2901(10). At the time of the events at issue here, however, no such definition existed. The parties agree that the now-repealed statute continues to apply in this case.

5

The court rejects both arguments. This issue was reopened by Judge Crawford out of concern about a possible violation of political free speech rights. While no doubt frustrating to the State, the court can understand a judge wishing to correct a prior interlocutory ruling he now suspected might be in error as a result of changes in the law. Likewise, while the court understands that RGA would like Judge Crawford's 2012 discussion of the law to be binding, he did not actually rule definitively on any substantive motion with regard to the $2,000 limit after the issue was reopened. The issue is now squarely before the court.

## B. The Law

The parties take very different approaches to the law. The State argues that the independence that avoids the appearance of corruption and allows unlimited contributions requires strict separation between the independent-expenditure-only committee and the candidate or another committee that coordinates with or contributes to the candidate. It presents an eight-part test for determining independence.[6] As the State conceded at oral argument, however, no case sets forth the eight-step test it proffers. Rather, it has combined the criteria from different cases.

RGA, on the other hand, argues that adequate independence exists so long as funds that support direct contributions or coordination come from an account into which only compliant contributions—that is, contributions under $2,000 each—were deposited.

An organization that makes both independent expenditures and coordinated campaign contributions is referred to as a "hybrid" entity. The courts are divided on how to analyze such

---

[6] "To maintain adequate independence from candidates and parties, an independent-expenditure-only PAC and any related direct-contribution PAC must (1) each have its own board of directors and staff, (2) each have its own people plan and implement political strategies and spending decisions, (3) each conduct its own fundraising appeals, (4) assiduously segregate funds so that funds raised by the independent-expenditure group are not used to pay costs incurred by the direct expenditure group, (5) prevent the movement of funds from the independent expenditure account to the direct expenditure account, (6) each pay its own overhead costs, (7) maintain separate identities in the public view, and (8) not use the dual accounts as a mechanism to circumvent reporting requirements or valid contribution limits." State's Motion for Summary Judgment 17–18 (filed Mar. 21, 2014).

organizations. *See, e.g.*, Alabama Democratic Conference v. Broussard, 541 Fed.Appx. 931, 934 n.3 (11th Cir. 2013) ("Several courts in other circuits have addressed whether the establishment of separate bank accounts for independent expenditures and campaign contributions by a hybrid organization, such as ADC, sufficiently eliminates the possibility of corruption or the appearance of corruption to render contribution limits unconstitutional. These courts have reached conflicting conclusions."). As another court recently noted, "[c]ontributions earmarked solely for use in independent expenditures by 'hybrid' political committees that engage in both independent expenditures and direct contributions to candidates appears destined to be a coming campaign-finance law battleground." Catholic Leadership Coalition of Texas v. Reisman, 764 F.3d 409, 442 (5th Cir. 2014).

RGA's two-account theory finds support in a pre-Citizens United decision, Emily's List v. Fed. Election Comm'n, 581 F.3d 1 (D.C. Cir. 2009). That case said that a hybrid organization "simply must ensure, to avoid circumvention of individual contribution limits by its donors, that its contributions to parties or candidates come from a hard-money account."[7] Id. at 12. In other words, a single "hybrid" entity may both contribute to or otherwise coordinate with a candidate *and* receive unlimited contributions in support of independent expenditures—with no functional separation within the organization—so long as separate accounts distinguish funds received and used for the different types of activities. Carey v. Fed. Election Comm'n, 791 F.Supp.2d 121, 135 (D.D.C. 2011) ("As long as Plaintiffs strictly segregate these funds . . . they are free to seek and expend unlimited soft money funds geared toward independent expenditures."); *see also*, Republican Party of New Mexico v. King, 741 F.3d 1089, 1100–01 (10th Cir. 2013).

Other courts have rejected that proposition. *See, e.g.*, Stop This Insanity, Inc. Emp.

---

[7] A "hard money" account means an account subject to contribution limits; "soft money" is money "that is not subject to source and amount limits[.]" Carey v. Fed. Election Comm'n, 791 F. Supp. 2d 121, 126 (D.D.C. 2011); Shays v. Fed. Election Comm'n, 528 F. 3d 914, 917 (D.C. Cir. 2008).

Leadership Fund v. Fed. Election Comm'n, 902 F.Supp.2d 23, 43 (D.D.C. 2012) ("When a single entity is allowed to make both limited direct contributions and unlimited independent expenditures, keeping the bank accounts for those two purposes separate is simply insufficient to overcome the appearance that the entity is in cahoots with the candidates and parties that it coordinates with and supports.").[8]

The Second Circuit in Vermont Right to Life Committee clearly rejected the same two-account theory that RGA espouses here. Vermont Right to Life Committee, Inc. v. Sorrell, 758 F.3d 118 (2014). The Court explained that independence requires a lack of coordination with the candidate:

> Although some courts have held that the creation of separate bank accounts is by itself sufficient to treat the entity as an independent-expenditure-only group, we do not believe that is enough to ensure there is a lack of "prearrangement and coordination." A separate bank account may be relevant, but it does not prevent coordinated expenditures—whereby funds are spent in coordination with the candidate.

Id. at 141 (citation and footnote omitted). *Accord*, Alabama Democratic Conference v. Broussard, 541 Fed.Appx. 931, 935 (11th Cir. 2013) ("When an organization engages in independent expenditures as well as campaign contributions, . . . its independence may be called into question and concerns of corruption may reappear. At the very least, the public may believe that corruption continues to exist, despite the use of separate bank accounts, because both accounts are controlled and can be coordinated by the same entity.").

The court finds the Second Circuit's analysis persuasive. When the issue is coordination between different political committees, or between different parts of one committee, one of

---

[8] The court also distinguished Emily's List as not addressing either contribution limits or "independent expenditures." Stop This Insanity, 972 F. Supp. 2d at 41 ("[N]one of the expenditures at issue involved express advocacy for or against a clearly identified federal candidate. Rather, the expenditures involved in EMILY's List were either issue-based advocacy or voter turnout and registration activities.").

which coordinates with a candidate, there must be "[s]ome actual organizational separation between the groups . . . to assure that the expenditures are in fact uncoordinated." Id. The Court noted that whether the groups actually are functionally distinct "may depend on factors such as the overlap of staff and resources, the lack of financial independence, the coordination of activities, and the flow of information between the entities." Id. at 142. It did not need to determine precisely how functionally distinct any two such groups need be because in the case before it the two entities were so thoroughly enmeshed financially and otherwise that they were "functionally indistinguishable." Id. at 145.[9]

The court adopts the Second Circuit's analysis for purposes of this case. Some functional distinction between related committees is required. Otherwise, the "separation" between the parts of a hybrid organization is merely an accounting entry. Expenditures cannot be truly "independent" if they are entirely controlled by the identical entity that is simultaneously making expenditures in coordination or cooperation with a campaign or party.

## C. Analysis

The conclusion that *some* functional distinction between RGA and GMP is necessary decides the matter in this case. RGA disputes few of the facts alleged by the State. *See* RGA's Statement of Disputed Material Facts (filed Apr. 24, 2014) (limiting the factual dispute to the State's allegations in paragraphs 19, 22, 23, 69, and 75 of its Statement of Undisputed Material Facts (filed Mar. 21, 2014)). RGA's own Statement of Undisputed Material Facts (filed Mar. 24, 2014) addresses the process by which RGA financed GMP, but does not address the larger issue of functional separation.

---

[9] The Court implied that there may be room for flexibility with regard to organizations with limited resources. *See* Vermont Right to Life Committee, 758 F.3d at 145 ("We acknowledge, though, that especially with committees that operate with low funding levels, small staff, and few resources, it will be difficult at times to maintain separation among those committees.").

There is no dispute that RGA determined and controlled all of GMP's activities and finances. *See generally* the affidavits of RGA representatives Michael G. Adams (State's Appendix at E), Joanne M. Parker (State's Appendix at F), and Dennise R. Casey (State's Appendix at N). There is no meaningful sense in which GMP was separate from RGA. GMP was a bank account and the name under which RGA operated for certain purposes in Vermont, but it had no employees or members. It had no separate board, and no separate tax identification number. No allocation of time or expenses of the staff was ever made between the two entities. GMP received all of its funds directly from RGA and never solicited or received a contribution from anyone. RGA solicited and received contributions nationally. It would then allocate funds to GMP to cover GMP's approved expenses, re-characterizing self-selected contributions to itself as contributions to GMP for reporting purposes in Vermont. RGA reported as its own certain expenditures to the IRS, but reported to Vermont that those same expenditures were made by GMP. People making contributions to RGA would not be aware that their contributions might end up in individual state PACs such as GMP.

In addition, ads paid for from RGA and GMP accounts were produced by a media firm that was not aware there was any distinction between the two entities, or even that GMP existed. Ads run under the GMP name were billed to and paid for by RGA. Research done on Democratic gubernatorial candidate Deborah Markowitz, and later shared with Republican candidate Brian Dubie, was paid in part by RGA and part by GMP. An ad called "Taxing Shumlin" was paid for by RGA, not GMP, but stated at times that it was paid for by RGA and at other times that it was paid for by GMP.

In sum, there is no indication of any true functional separation between RGA and GMP. But for a separate checkbook, they were one and the same. The $2,000 contribution limit

10

constitutionally applies to RGA.

Order

The State's motion for summary judgment is granted; RGA's is denied. The case will be set for a penalty hearing.

Dated at Montpelier this 20th day of October 2014.

_____
Helen M. Toor
Superior Court Judge